## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NABIL MIKHAIL,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **JOLIE KAHN et al.,** | : | **No. 13-5130** |
| *Defendants*. | : | |

## O P I N I O N

PRATTER, J.                                                                          JANUARY 13, 2014

"On December 1st, 2009, Ms. Kahn initiated what will be a very contentious divorce and custody" proceedings in the Montgomery County Court of Common Pleas. Compl. ¶¶ 2, 14. This prescient understatement launches a litany of allegations in a 47-page, 279-paragraph Complaint from pro se Plaintiff Nabil Mikhail, who claims that his soon-to-be-ex-wife, Jolie Kahn, along with her former lawyer, Dorothy Phillips, and her current lawyer, Alan Fellheimer, conspired with court-appointed psychologists and a psychiatrist, as well as a nonprofit attorney, two child visitation supervisors, and nine Pennsylvania judges, to deprive him of his federal constitutional rights through state court protection from abuse proceedings as well as custody and divorce proceedings. Mr. Mikhail purports to bring his federal claims under 18 U.S.C. § 242 and 42 U.S.C. § 1983 (Counts I and II). He also raises state law claims in Counts III through VI. All the Defendants have moved to dismiss (Docket Nos. 9, 18, 21, 22, 23, 33, 38, 39).[1]

For the reasons explained below—the *Rooker–Feldman*[2] doctrine's jurisdictional bar, *Younger*[3] abstention, the United States Attorney's sole discretion to prosecute a federal crime,

---

[1] Only Chip Minto has not moved to dismiss, but it appears that he has not been served. The Complaint will also be dismissed against him for the reasons discussed herein.

[2] *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[3] *Younger v. Harris*, 401 U.S. 37 (1971).

§ 1983's statute of limitations, the private Defendants' non–state actor status under § 1983, failure to state claims upon which relief may be granted, and judicial and quasi-judicial immunity—the Court dismisses Mr. Mikhail's Complaint in its entirety.[4]

## I.      FACTUAL AND PROCEDURAL BACKGROUND[5]

In December 2009, Ms. Kahn filed for divorce from Mr. Mikhail and also brought a protection from abuse ("PFA") petition against him. As the result of a PFA order entered after an *ex parte* hearing, Mr. Mikhail "was evicted from the marital home at 2 a.m. on December 2, 2009" by the police and was "banned from seeing his daughter for 2 weeks." Compl. ¶ 16. Although another judge "dismissed the Child from the PFA" a week later, that second judge appointed Defendant Dr. Herbert Lustig "to perform a custody evaluation," and this first PFA otherwise remained in effect until May 2011. Compl. ¶ 17. Ms. Kahn also obtained sole custody of her and Mr. Mikhail's minor child, allegedly on an *ex parte* basis, although Mr. Mikhail's

---

[4] The Court's ruling should not be misinterpreted as an endorsement, or even an acceptance, of the tone, accusations, or any *ad hominem* remarks leveled against Mr. Mikhail in some of the Motions to Dismiss. Indeed, the Court is quite unimpressed with such language, style, or tactics. For example, labeling as a "disgruntled litigant" a father who is seeking to regain custody of his child and vindicate what he sees as the violation of his constitutional rights, is unhelpful and even callous, even if case law militates strongly against him. Nonetheless, the dismissal here flows from the Court's evaluation of intricate, but longstanding, legal principles under which this Court lacks the authority to afford Mr. Mikhail the relief he seeks.

[5] Mr. Mikhail's Complaint is not a model of clarity or specificity, with regard either to chronology or his legal claims, but the Court discerns the following factual allegations, which, to the extent that they are not conclusory (and many are), the Court assumes to be true for purposes of adjudicating the Motions to Dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Mr. Mikhail invokes the Court's federal question jurisdiction. Because the Court, after dismissing all of Mr. Mikhail's federal claims, will decline to exercise supplemental jurisdiction over his state law claims, this summary does not address his allegations regarding the claimed unlawfulness of the Defendants' alleged conduct under Pennsylvania law.

allegations do not make clear whether this custody award was related to the PFA proceedings or to the separate, ongoing custody proceedings.

Mr. Mikhail claims that in January 2010 Dr. Lustig conspired with Ms. Kahn and Ms. Kahn's then-attorney, Dorothy Phillips (now deceased), to falsely report that Mr. Mikhail had sexually abused their child. *See* Compl. ¶ 21. Specifically, Mr. Mikhail claims that Ms. Kahn "bribed Dr. Lustig and conspired with him to incriminate [Mr. Mikhail] as [Mr. Mikhail] paid him $6,500 for the evaluation between December 2009 and April 2010 while Mother [Ms. Kahn] paid him $12,500 for services rendered at the same time." Compl. at 10. Mr. Mikhail claims that Dr. Lustig refused to prepare testimony in favor of Ms. Kahn unless she paid him—after which point he prepared a favorable report for her.

While the authorities investigated Ms. Kahn's reports of abuse, she filed a second PFA petition, which, again, the presiding judge temporarily granted *ex parte* and, Mr. Mikhail contends, erroneously. Compl. ¶¶ 22-23. Then, notwithstanding the authorities' subsequent dismissal of the child abuse allegations as unfounded, Mr. Mikhail alleges, another judge "ordered [him] to see Child only SUPERVISED, and for LIMITED amount of time," Compl. ¶ 25, and to use the corrupt "Kids First" service for supervision. That same judge also entered an order granting the second PFA petition after a hearing on April 9, 2010. This PFA order, which expired in April 2011, was subsequently extended for one year. When Mr. Mikhail sought an appeal (his Complaint is not clear as to which orders, precisely, he appealed), the Pennsylvania Superior Court affirmed "through numerous non-precedential decisions containing falsehoods and in violation of Plaintiff [sic] constitutional rights." Compl. ¶ 29.

Mr. Mikhail also alleges that Ms. Kahn used Dr. Lustig's services for their child without "the approval of [Mr. Mikhail] or the Child Advocate," Compl. at 10—that is, it seems, beyond

Dr. Lustig's permitted role as court-appointed custody evaluator. For reasons not entirely clear from the Complaint, in December 2010, the trial court dismissed Dr. Lustig from the domestic relations case and ordered his files and records released. On January 7, 2011, after reviewing these newly available documents, Mr. Mikhail filed a petition for contempt in which he attempted to show "that the PFA was secured through Fraud upon the Court." *See* Compl. ¶¶ 30-31.

Mr. Mikhail complains of a number of harms allegedly emanating from the state court proceedings and rulings, including, for example, a judge's failure to schedule a hearing for "over 22 months," Compl. ¶ 33; the court's dismissal of his petition to expunge the PFA orders entered against him, *see* Compl. ¶¶ 34, 43; the court's entry of an order, after a hearing at which no evidence was presented, that Mr. Mikhail could not take the child out of Pennsylvania, Compl. ¶ 36; the court's hearing of Ms. Kahn's petition for custody before Mr. Mikhail's petition for custody, Compl. ¶ 42; the court's dismissal of Mr. Mikhail's various subpoenas, *see* Compl. ¶ 44(1); and the court's failure or refusal to ask the child advocate/guardian ad litem to be present at a hearing concerning the child, in favor of allowing Ms. Kahn's attorney to represent the child, *see* Compl. ¶¶ 45, 46. Mr. Mikhail also alleges that he was denied alimony *pendente lite* for over two years and that he alone was required to pay the cost of visitation supervisors and the reunification therapist. Compl. ¶¶ 49, 52.

Within this context of assigning error to the defendant judges and their rulings, Mr. Mikhail avers that Maddi-Jane Sobel, the second court-appointed custody evaluator, "insulted [Mr. Mikhail] in his faith and distorted facts and reported false testimonies." Compl. at 19. He also alleges that Dr. Anthony Pisa, the court-appointed reunification therapist, inappropriately conferred with the court in a meeting from which counsel were excluded; that the court

impermissibly relied on this *ex parte* meeting instead of considering the evidence before it, Compl. at 20; that during proceedings, Dr. Pisa was "[n]ot being honest" with the court because, for instance, he opined that Ms. Kahn cooperated with the therapy when, Mr. Mikhail asserts, she did not, *see* Compl. ¶¶ 176–179; and that Dr. Pisa conspired with Ms. Kahn inasmuch as he "did not submit a reunification plan as required by [court] order by December 19, 2012," Compl. ¶ 48. Against Preston Findlay, counsel for the nonprofit National Center for Missing and Exploited Children, Mr. Mikhail levels an allegation of conspiracy with Ms. Kahn to "provide an affidavit that match[ed] their goals." Compl. ¶ 37. And Mr. Mikhail further claims, after alleging almost no factual content, that Sheila Dugan and Chip Minto, employees of Kids First, conspired with Ms. Kahn to keep him from his daughter.

Mr. Mikhail attempts to channel these alleged wrongdoings into six counts, which often refer to all of the Defendants collectively. He rarely specifies how any given alleged wrongful activity was unlawful or unconstitutional. *See* Compl. at 24-32. Counts I and II purport to state violations of 18 U.S.C. § 242 and 42 U.S.C. § 1983, and both, among other things, claim that the judges discriminated against Mr. Mikhail "because of race, gender, [and] religion." Compl. ¶¶ 218, 239. Count I does not indicate the conduct complained of, but it seems to refer to the custody and divorce proceedings because Count II, in contrast, refers explicitly to the PFA orders. In Count II, Mr. Mikhail claims that the entry of the PFA orders, especially those entered *ex parte*, violated his constitutional rights by, inter alia, leading to his eviction from the marital home in the middle of the night and because of the accusations of child abuse. He further asserts that the PFA orders "were secured through fraud upon the court" and were themselves erroneous and unconstitutional. Compl. ¶ 235. Finally, Counts III through VI consist of state law claims

for, respectively, violation of Pennsylvania's Code of Judicial Conduct and its Rules of

Professional Conduct; civil conspiracy; concerted tortious action; and malicious prosecution.

For the Defendants' alleged wrongdoing, Mr. Mikhail seeks injunctive relief, including

"[r]elief of all orders made in violation of the Law," a judicial command that the Defendants

cease violating his constitutional rights, a declaration (but, for reasons explained below, not truly

declaratory relief) that the PFA orders are unconstitutional, as well as monetary damages, costs,

and attorneys' fees. Compl. at 46.


## II.     STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8

of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim

showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to 'give the

defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original), the

plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do," *id.*

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough

to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is

not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to

cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation

and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a

context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). The Court must also accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). But that admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). Finally, "if a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an

7

amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

For practical reasons, complaints filed by pro se litigants like Mr. Mikhail are held to somewhat "less stringent standards" than those drafted by lawyers. *See Henry v. Moore*, 500 F. App'x 115, 117 (3d Cir. 2012); *see also Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) ("[W]e tend to be flexible when applying procedural rules to pro se litigants, especially when interpreting their pleadings."). Even so, the Court must still fulfill its gatekeeper role. *See Mala*, 704 F.3d at 245. Pro se litigants cannot expect wholesale indulgence of whatever they claim and however they claim it.

## III.    DISCUSSION

Mr. Mikhail's Complaint and the Defendants' Motions to Dismiss raise many issues. Many of the defenses overlap, and indeed, although the Complaint must ultimately be dismissed in its entirety, no single doctrine or legal principle is dispositive as to the whole pleading. Thus, for instance, although most of Mr. Mikhail's claims against the judges might be dismissed on the basis of judicial immunity alone, their discharge on that basis does not resolve the claims against the other Defendants or, possibly, some of Mr. Mikhail's requests for "declaratory" relief; moreover, jurisdictional issues—the family of legal principles to which *Rooker–Feldman* belongs, and to which *Younger* abstention is a close cousin—must come first.[6]

---

[6] *See, e.g.*, *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 161 (3d Cir. 2010) ("*As a threshold matter*, we address Defendants' contention that the *Rooker–Feldman* doctrine precludes the exercise of subject matter jurisdiction over this action." (emphasis added)). Absolute immunity is also a "threshold issue," *e.g.*, *B.S. v. Somerset County*, 704 F.3d 250, 261 n.22 (3d Cir. 2013), but not a jurisdictional one, and is properly addressed after *Rooker–Feldman* claims, *e.g.*, *id.* at 259-61. Without jurisdiction, of course—*juris*, the law, plus *dictio*, the act of speaking—a court literally lacks the power to say what the law is: "Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same

Under the *Rooker–Feldman* doctrine, the Court is without power to hear Mr. Mikhail's claims based on the state courts' protection from abuse orders, which are now final. Similarly, the Court must abstain pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), from considering Mr. Mikhail's alleged custody- and divorce-based claims because those state proceedings are ongoing within the meaning of that doctrine. At the same time, Mr. Mikhail's allegations of conspiracy among or between the defendant judges and court-appointed officials and Ms. Kahn and her attorneys must be considered separately because, if they are credited, they are not barred by *Rooker–Feldman* (given that the due process injury would not result from the judgments), or by *Younger* (because such a conspiracy would almost certainly fall into *Younger*'s narrow carve-out for "exceptional circumstances").[7]

The claims that elude these jurisdictional watchdogs still must face a second line of rigorous defenses, several of which also would render any amendments to certain claims futile, if it were not so already. *See Phillips*, 515 F.3d at 236. For example, Mr. Mikhail seeks to bring claims under 18 U.S.C. § 242, a criminal statute, but as a private citizen, he cannot do so. He is also barred from bringing claims under 42 U.S.C. § 1983 against a number of the Defendants by the statute's two-year statute of limitations in Pennsylvania. And against several of the Defendants he has failed to state a claim upon which relief can be granted in any event. For instance, he cannot sue Ms. Kahn and her attorneys under § 1983 because they were not state actors (i.e., they did not act under color of law). And, of course, to the extent that any claims then remain against the judges or the court-appointed Defendants, these individuals have judicial and quasi-judicial immunity, respectively, that protects them from both claims for damages and

---

thing as an advisory opinion, disapproved by [the Supreme] Court from the beginning." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).

[7] Moreover, *Younger* does not appear to bar claims (at least those in this case) for money damages, as discussed later in this Opinion.

claims for injunctive relief. The application of all of these doctrines and, to the extent possible, their relationship *inter se*, are explained in detail below.

Finally, because these doctrines, requirements, and principles eliminate all of Mr. Mikhail's federal claims, the Court will decline to exercise supplemental jurisdiction over the state law claims.

### A.    The *Rooker–Feldman* Doctrine

Much of the relief that Mr. Mikhail seeks from the PFA orders entered against him must be dismissed for lack of jurisdiction pursuant to the *Rooker–Feldman* doctrine.[8]

Under *Rooker–Feldman*, "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010). Named after the two Supreme Court cases that announced it, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), *see Skinner v. Switzer*, 131 S. Ct. 1289, 1297 (2011), the doctrine instructs "that the Supreme Court of the United States, and not the lower federal courts, has jurisdiction to review a state court decision," *Parkview Associates Pushup v. City of Lebanon*, 225 F.3d 321, 324 (3d Cir. 2000). The doctrine is not broad, but, rather, stands for the proposition that there exist "limited circumstances in which [the Supreme] Court's appellate jurisdiction over state-court judgments, 28 U.S.C. § 1257, precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority, *e.g.*, § 1330 (suits against

---

[8] The custody- and divorce-based claims, however, do not necessarily run afoul of *Rooker–Feldman* but should instead be analyzed for *Younger* abstention.

foreign states), § 1331 (federal question), and § 1332 (diversity)." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005).

In 2005, observing that the *Rooker–Feldman* "doctrine has sometimes been construed to extend far beyond the contours of the *Rooker* and *Feldman* cases," *Exxon Mobil*, 544 U.S. at 283, the Supreme Court began an effort to narrow the doctrine, first in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, and most recently in *Skinner v. Switzer*, 131 S. Ct. 1289. As the Supreme Court has now explained, "*Rooker–Feldman* is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers inviting district court review and rejection of the state court's judgments"—i.e., it does not apply to harms somehow related to, but not caused by, state court judgments. *Skinner*, 131 S. Ct. at 1297 (internal quotation marks and alterations omitted) (quoting *Exxon Mobil*, 544 U.S. at 284). Indeed, the four requirements for application of the doctrine, as broken down by the Third Circuit Court of Appeals, measure its reduced reach, *see Great W. Mining & Mineral Co.*, 615 F.3d at 166-67, as follows:

> (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. *Exxon Mobil*, 544 U.S. at 284. The second and fourth requirements are the key to determining whether a federal suit presents an independent, non-barred claim.

*Great W. Mining & Mineral Co.*, 615 F.3d at 166 (alterations in original).

The second requirement, in particular, merits brief elaboration here. Unless the injury of which the federal plaintiff complains was caused by a state court judgment itself, the claim is not barred, *see id.*, even if this "independent claim . . . denies a legal conclusion that a state court has reached in a case to which he was a party," *Exxon Mobil*, 544 U.S. at 293 (internal quotation marks and alterations omitted); *accord Skinner*, 131 S. Ct. at 1297. Thus, for instance, the

Supreme Court has instructed, where a plaintiff challenges not "the adverse . . . decisions themselves," but "instead he targets as unconstitutional the [state] statute they authoritatively construed," then *Rooker–Feldman* does not apply and the federal district court has jurisdiction to consider the "statute or rule governing the [state court] decision," *Skinner*, 131 S. Ct. at 1298—even if the plaintiff "could have raised his federal claim in the [state] proceeding," *id.* at 1298 n.11.

To be sure, the correct application of this requirement can be difficult in practice. "The critical task is . . . to identify those federal suits that profess to complain of injury by a third party, but actually complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it.'" *Great W. Mining & Mineral Co.*, 615 F.3d at 167 (quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 88 (2d Cir. 2005)). If the defendants, rather than the state court judgments, caused the injuries complained of, *Rooker–Feldman* does not apply and the district court is not barred from reviewing those injuries. *Id.* Assessing whether the doctrine applies can be particularly difficult in cases like Mr. Mikhail's, where "a federal plaintiff complains of an injury that is in some fashion related to a state-court proceeding," *id.*—such as a claim for fraud upon the court or a claimed conspiracy with the defendant judges, neither of which necessarily compels the conclusion that the state court erred in its decisions—because even injuries that "help[] to cause the adverse state judgments" may be "independent" of those judgments, *id.* at 168.

It is unnecessary to resurvey more extensively the post–*Exxon Mobil* doctrine's topography here, however, because the Third Circuit's recent case law contains a rather thorough discussion, particularly in *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d at 163-73, that readily can be applied to Mr. Mikhail's Complaint. His Complaint references

three sets of state court proceedings: protection from abuse proceedings, custody proceedings, and divorce proceedings. For reasons explained below, while *Rooker–Feldman* might apply to certain aspects of the protection from abuse proceedings (namely, injuries caused by the PFA orders), it cannot, for reasons explained below, apply to the child custody proceedings or to the divorce proceedings, which also appear to be ongoing.

### 1. The Protection from Abuse Orders

Mr. Mikhail's Complaint avers that the protection from abuse proceedings have terminated and that he is no longer under any PFA order. Apparently, Ms. Kahn filed a total of five PFA petitions, the third, fourth, and fifth of which were withdrawn, dismissed, and stricken, respectively. Compl. ¶ 278(2)(3)–(5). Accordingly, these petitions serve as bases only for Mr. Mikhail's state law malicious prosecution claim (Count VI). The first two PFA petitions, by contrast, resulted in PFA orders, both temporary and for defined durations. *See, e.g.*, Compl. ¶¶ 16, 18, 22, 23, 28, 34, 57, 68, 203, 233. The first PFA expired in May 2011, Compl. ¶ 17, and the second expired in or around April 2012, *see* Compl. ¶¶ 203, 233. The state court refused to expunge the record of them. Compl. ¶ 34. Thus, for immediate purposes, all the PFA orders are final and have expired or otherwise been dismissed, notwithstanding the fact that during their pendency they could have been modified. *See* 23 Pa. Cons. Stat. Ann. § 6117 ("The plaintiff and the defendant may seek modification of an order issued under section 6108 (relating to relief) at any time during the pendency of an order. Except as otherwise indicated in this chapter, modification may be ordered after the filing of a petition for modification, service of the petition and a hearing on the petition.").

*Rooker–Feldman* thus applies to Mr. Mikhail's alleged injuries caused by the first and second PFA orders because all of the four prongs of the doctrine are satisfied. *See also, e.g.*, *Walker v. Court of Common Pleas*, No. 12-2206, 2013 WL 4647485, at *4-5 (M.D. Pa. Aug. 29,

2013) (applying *Rooker–Feldman* to a case involving protection from abuse orders). First, Mr.

Mikhail "lost" in state court because the PFA orders were entered against him. Second, the only

injuries that will be barred are those caused by the PFA orders, as discussed further below. Third,

the orders became final before Mr. Mikhail filed the present suit. Finally, Mr. Mikhail invites

this Court to review and reject the PFA orders.

Because all four elements are present, *Rooker–Feldman* applies, and it applies, moreover,

"even if those challenges allege that the state court's action was unconstitutional." *Feldman*, 460

U.S. at 486. As the Third Circuit Court of Appeals has explained, "When a federal plaintiff

brings a claim, *whether or not raised in state court*, that asserts injury caused by a state-court

judgment and seeks review and reversal of that judgment, the federal claim is 'inextricably

intertwined' with the state judgment" and therefore barred from review. *Great W. Mining &*

*Mineral Co.*, 615 F.3d at 170 (emphasis added). "Review of [state court] decisions may be had

only in [the Supreme] Court." *Feldman*, 460 U.S. at 486.

The Second Circuit Court of Appeals has explained this aspect of the doctrine in a

passage endorsed in *Great Western Mining & Mineral Co*, *see* 615 F.3d at 167, and particularly

useful here:

> [A] federal plaintiff cannot escape the *Rooker–Feldman* bar simply by relying on
> a legal theory not raised in state court. Suppose a state court, based purely on state
> law, terminates a father's parental rights and orders the state to take custody of his
> son. If the father sues in federal court for the return of his son on grounds that
> the state judgment violates his federal substantive due-process rights as a parent, he is
> complaining of an injury caused by the state judgment and seeking its reversal.
> This he may not do, regardless of whether he raised any constitutional claims in
> state court, because only the Supreme Court may hear appeals from state-court
> judgments.

*Hoblock*, 422 F.3d at 87.

Mr. Mikhail's claim that the state court denied him due process by making *ex parte* decisions does not bring review of those decisions within this Court's jurisdiction. On this point, the Supreme Court's explanation in *Feldman* is instructive:

> [I]t is clear that [Respondents'] allegations that the District of Columbia Court of Appeals acted arbitrarily and capriciously in denying their petitions for waiver and that the court acted unreasonably and discriminatorily in denying their petitions in view of its former policy of granting waivers to graduates of unaccredited law schools required the District Court to review a final judicial decision of the highest court of a jurisdiction in a particular case. These allegations are inextricably intertwined with the District of Columbia Court of Appeals' decisions, in judicial proceedings, to deny the respondents' petitions. The District Court, therefore, does not have jurisdiction over these elements of the respondents' complaints.

460 U.S. at 486-87 (citation omitted); *see also, e.g.*, *Middlebrook at Monmouth v. Liban*, 419 F. App'x 284, 285-86 & n.2 (3d Cir. 2011) (per curiam) ("[Plaintiff] argues that violations of his due process rights stemmed from the state court trial judge's errors and that her errors are substantial enough to merit a different outcome . . . . Although [he] described, among other things, alleged due process violations by the trial judge, they were not independent claims, as he asserts. . . ."), *cert. denied*, 132 S. Ct. 247 (2011).[9]

---

[9] *See also, e.g.*, *Ludwig v. Berks County*, 313 F. App'x 479, 481 (3d Cir. 2008) (per curiam) ("Because a ruling that Ludwig's due process rights were violated based on Judge Keller's rulings would have required the District Court to find that the state court judgment was erroneous, the *Rooker–Feldman* doctrine bars Ludwig's claims against Judge Keller."); *O'Callaghan v. Harvey*, 233 F. App'x 181, 183-84 (3d Cir. 2007) (per curiam) ("Appellant's concerns about the constitutionality of the state court orders and the procedures employed in those state court actions are properly the subject for direct appeal. They may not be brought through collateral attack of the sort mounted in O'Callaghan's federal court action, which explicitly invites the District Court to review and reverse an unfavorable state court judgment."); *In re Knapper*, 407 F.3d 573, 581 (3d Cir. 2005) ("Knapper's due process attack on the state court judgments asserts that the state lacked personal jurisdiction over her because of defective service of process. Knapper can only prevail if a federal court concludes that the state courts' default judgments were improperly obtained." (alterations and internal quotation marks omitted)); *Rose v. County of York*, No. 05-5820, 2007 WL 136682, at *3 (E.D. Pa. Jan. 12, 2007) ("[P]laintiff's claim that the orders of various Lehigh and York County judges were motivated by racism is barred because the injuries are the racially-motivated decisions, the state court judgments themselves."), *aff'd*, 262 F. App'x 485 (3d Cir. 2008); *Price v. Porter*, 351 F. App'x

Specifically, then, the following of Mr. Mikhail's claims and requests for relief are

barred:

- "[B]ecause of this [first] PFA, [Mr. Mikhail] was evicted from the marital home . . . and banned from seeing his daughter for 2 weeks . . . ." Compl. ¶ 16. Although the court later dismissed parts of this PFA relating to child abuse, it was this order, rather than the actions of the Defendants, that harmed Mr. Mikhail.[10]

_____

925, 926-27 (5th Cir. 2009) (per curiam) ("Price's complaint asserts that Judge Porter should have been recused and challenges the validity of the outcome in the state court proceedings. The district court correctly held that Price's complaint comprised a collateral attack on the state court's judgment, and accordingly, under the *Rooker–Feldman* doctrine, the federal district court had no subject-matter jurisdiction to hear the action."); *Brown v. Cadden*, No. 13-2201, 2013 WL 6182067, at *7 (M.D. Pa. Nov. 25, 2013) ("Mrs. Brown's due process claim is barred by the *Rooker–Feldman* doctrine because the claim is based on the allegation that her constitutional rights were violated as a result of the dismissal of the support action.").

[10] There may be some question as to whether *Rooker–Feldman* applies to Mr. Mikhail's pre-notice and hearing eviction from his home (as the initial PFA hearing and issuance of the temporary order were *ex parte*). Before *Exxon Mobil*, some courts of appeals seemed to carve out an exception to *Rooker–Feldman* by observing that the doctrine "can apply only where the plaintiff had a reasonable opportunity to raise his federal claim in state proceedings." *Wood v. Orange County*, 715 F.2d 1543, 1547 (11th Cir. 1983); *accord, e.g.*, *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 606 (7th Cir. 2008). The Third Circuit Court of Appeals appears not to have adopted this exception, although it suggested before *Exxon Mobil* that considering claims not raised in state court might not "require the federal court to determine that the state court was wrong." *Parkview Associates P'ship*, 225 F.3d at 326. (There is logic to the notion that if the claim of unconstitutionality could not be raised, the state court could not have considered it, and thus its judgment could not be criticized as "wrong" on a point it never reached.) But as the Seventh Circuit Court of Appeals has more recently noted, "Post–*Exxon Mobil*, the 'reasonable opportunity' exception to the *Rooker–Feldman* doctrine is of questionable viability" because

> the Supreme Court definitively concluded in *Exxon Mobil* that lower federal courts do not have subject matter jurisdiction in cases in which the plaintiff complains of an injury that cannot be separated from the state court judgment. In those cases, regardless of the opportunity that he or she had to raise a claim in state court, the litigant must appeal through the state court system and then seek review in the United States Supreme Court by filing a writ of certiorari.

*Kelley*, 548 F.3d at 607. This Court agrees and holds, therefore, that it is barred by *Rooker–Feldman* from reviewing even those alleged harms resulting from the first, temporary, *ex parte* PFA order.

Still, even if such a "reasonable opportunity" exception *were* to apply, only a damages claim would remain (because any injunctive relief this Court could give would be, in fact, otherwise foreclosed by the subsequent PFA rulings), and the defendant judges are absolutely immune

- "Judge Haaz dismissed [Mr. Mikhail's] petition to expunge [the] PFAs without justification and without due process, all in violation of [Mr. Mikhail's] constitutional rights." Compl. ¶ 34. This Court lacks jurisdiction to review Mr. Mikhail's claim of injury arising from Judge Haaz's order. Nor may it review Judge Haaz's order in order to "[i]ssue declaratory relief on Expungement of [the] PFAs that were secured through fraud upon the court, and entered in violation of Plaintiff's constitutional rights under the Color of Law." Compl. at 46.

- The court's *ex parte* entry of "PFA orders that were totally inappropriate and unconstitutional." Compl. ¶ 57. The *Rooker–Feldman* doctrine bars exactly this type of claim that a state court judgment was erroneous.

- The court's ordering Mr. Mikhail "to continue [s]upervised visitations and subject[ing] him to the same terms of [a] PFA although it was expired, and without a hearing or due process of law." Compl. ¶ 68. Mr. Mikhail's subjection to an extended PFA order is a harm caused by an order that this Court cannot sit to review.

- Mr. Mikhail claims that the Pennsylvania Superior Court's opinions that upheld the PFA rulings of the Court of Common Pleas "contain[ed] numerous falsehoods and [were] in violation of Plaintiff [sic] constitutional rights." Compl. ¶ 29; *see also* Compl. ¶¶ 73-82 (other assignments of error to the Superior Court's decisions). Inasmuch as Mr. Mikhail is asking this court to review "the erroneous decision of the Superior Court," Compl. ¶ 29, *Rooker–Feldman* makes clear that this Court has no jurisdiction to do so.

---

from damages claims. *See infra* subsection III.F.1. In addition, although Mr. Mikhail did not have a "reasonable opportunity" to raise his claims in the *ex parte proceeding*, he could have done so in the subsequent PFA proceedings. *See* 23 Pa. Cons. Stat. Ann § 6107 ("Within ten business days of the filing of a petition under this chapter, a hearing shall be held before the court, at which the plaintiff must prove the allegation of abuse by a preponderance of the evidence. The court shall, at the time the defendant is given notice of the hearing, advise the defendant of the right to be represented by counsel . . . ."); *see also, e.g., Ferko-Fox v. Fox*, 68 A.3d 917, 923 (Pa. Super. Ct. 2013) (discussing constitutional challenge to relating to *ex parte* hearings); *Commonwealth v. Miller*, 689 A.2d 238, 241 (Pa. Super. Ct. 1997) (discussing constitutional challenge); *Eichenlaub v. Eichenlaub*, 490 A.2d 918 (Pa. Super. Ct. 1985) (discussing constitutional challenge). Moreover, PFA orders may be appealed. *See, e.g., Kelley v. Mueller*, 912 A.2d 202, 203 (Pa. 2006); *Miller ex rel. Walker v. Walker*, 665 A.2d 1252, 1255 (Pa. Super. Ct. 1995).

- Finally, Mr. Mikhail prays for "[r]elief of all orders made in violation of the Law . . . . Compl. at 46. *Rooker–Feldman* bars this Court from reviewing Mr. Mikhail's blanket claim to relief from the state court PFA orders.

Other courts have reached similar conclusions.[11]

In addition, the Court cannot entertain Mr. Mikhail's plea to "[i]ssue declaratory relief on the Constitutionality of the PFAs in this case." Compl. at 46. To do so "would require [this Court] to conclude that the state court made an incorrect legal and/or factual determination and would effectively reverse the state decision or void its ruling. This is exactly the type of determination that the *Rooker–Feldman* doctrine prohibits." *Van Tassel v. Lawrence Cnty. Domestic Relations Sections*, 390 F. App'x 201, 203-04 (3d Cir. 2010) (per curiam) (citation omitted).

---

[11] *See, e.g.*, *Young v. Dubow*, 411 F. App'x 456, 458 (3d Cir. 2011) (per curiam) ("[T]hese requirements are met. Young's federal complaint stemmed from the adverse custody decision rendered in state court, Young claims that she and her children have been harmed by that decision, and she expressly asks the District Court to reverse Judge Dubow's custody award."); *McKnight v. Baker*, 244 F. App'x 442, 444-45 (3d Cir. 2007) ("In order for McKnight to prevail, the District Court would need to conclude that the Family Court erred in its suspension of McKnight's visitation rights, or that the various defendants have violated his constitutional rights in adhering to the dictates of that order. The District Court does not have jurisdiction to so conclude."); *McAllister v. Allegheny Cnty. Family Div.*, 128 F. App'x 901, 902 (3d Cir. 2005) (per curiam) ("Here, although couched as an action against the named defendants for damages, McAllister plainly seeks to void or overturn adverse rulings entered in the child-custody litigation by the Allegheny County Court of Common Pleas. The *Rooker–Feldman* doctrine prohibits District Courts from adjudicating actions in which the relief requested requires determining whether the state court's decision is wrong or voiding the state court's ruling." (citation and internal quotation marks omitted)); *Goodson v. Maggi*, 797 F. Supp. 2d 604, 613 (W.D. Pa. 2011) ("This doctrine applies even where the challenges to the state court judgment allege that the state court's action was unconstitutional, such as a deprivation of due process and equal protection rights."); *Leisure v. Pa. Dep't of Child Youth Servs.*, No. 10-7565, 2012 WL 1080142, at *7 (E.D. Pa. Mar. 30, 2012) ("Because the *Rooker–Feldman* doctrine bars this court from entering an order granting custody of S.R.C. and F.R.L. to plaintiff and or reinstating plaintiff's parental rights concerning S.R.C. or F.R.L., plaintiff's prayer for such relief is dismissed with prejudice.").

Some additional commentary on this point is necessary, however, because of the distinction between challenging adverse state court decisions themselves and challenging as unconstitutional the statutes on which those decisions rely. *See Skinner*, 131 S. Ct. at 1298.

This distinction, in essence, comes down to as-applied challenges versus facial challenges and the difference between "declaring" a state order, or application, of a rule or statute unconstitutional and declaring that rule or statute itself unconstitutional in an abstract sense.[12] The former—only reachable by reviewing a state-court decision—is barred by *Rooker–Feldman*; the latter—unless barred by another doctrine, such as standing—is not. Thus, a state court loser who seeks to challenge as unconstitutional the *statutory basis* for his loss will not find that particular claim barred by *Rooker–Feldman*. Indeed, one need not rely solely on the more recent guidance of *Skinner* or *Exxon Mobil*, for the *Feldman* Court drew this very same distinction:

> The Tenth Circuit Court of Appeals in *Doe v. Pringle*, [550 F.2d 596 (10th Cir. 1976)], properly emphasized the distinction between general challenges to state bar admission rules and claims that a state court has unlawfully denied a particular applicant admission. We have recognized that state supreme courts may act in a non-judicial capacity in promulgating rules regulating the bar. Challenges to the constitutionality of state bar rules, therefore, do not necessarily require a United States District Court to review a final state court judgment in a judicial proceeding. Instead, the District Court may simply be asked to assess the validity of a rule promulgated in a non-judicial proceeding. If this is the case, the District Court is not reviewing a state court judicial decision. In this regard, 28 U.S.C. § 1257 does not act as a bar to the District Court's consideration of the case and because the proceedings giving rise to the rule are non-judicial the policies prohibiting United States District Court review of final state court judgments are

---

[12] *See, e.g.*, *McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir. 2010) ("[B]y bringing an as-applied challenge, McKithen is asking the federal district court to review the validity of the state court judgment."); *Gee v. York Cnty. Court of Common Pleas*, No, 10-1987, 2010 WL 4942144, at *2 (M.D. Pa. Nov. 30, 2010) ("By alleging that his relationship with his daughter was terminated by the use of unconstitutional standards, Plaintiff complains of an injury caused by the state-court judgment. Additionally, his as-applied challenge invites review and rejection of that judgment in light of the nature of an as-applied challenge." (footnote omitted)); *cf. United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) ("An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.").

not implicated. United States District Courts, therefore, have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state court judgment in a particular case. They do not have jurisdiction, however, over challenges to state court decisions in particular cases arising out of judicial proceedings even if those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this Court. 28 U.S.C. § 1257.

*Feldman*, 460 U.S. at 485-86 (citations omitted). It should be apparent that statutes—in this case, 42 U.S.C. § 1983—are like *Feldman*'s state bar rules.

But, like the Third Circuit Court of Appeals in another case, the Court "believe[s] that [Mr. Mikhail] is not seeking declaratory relief in the true legal sense, however. *See* Fed. R. Civ. P. 57; 28 U.S.C. § 2201. [Although Mr. Mikhail] asks that the . . . Court 'declare' that his constitutional rights were violated[, *d*]eclaratory judgment is inappropriate solely to adjudicate past conduct*." *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (per curiam) (emphasis added); *see also, e.g.*, *Burrell v. Ross*, No. 12-2504, 2013 WL 3097320, at *5 (M.D. Pa. June 18, 2013) ("These claims simply ask the court to declare past action unconstitutional retroactively, which basically amounts to declaring one party liable to another, so declaratory judgment is not appropriate here."). Mr. Mikhail is really only asking for an as-applied ruling, and that is a request that *Rooker–Feldman* forbids the Court from even considering. *See, e.g.*, *Kwasnik v. LeBlon*, 228 F. App'x 238, 242 (3d Cir. 2007) (per curiam) ("The Amended Complaint requests review of the constitutionality of N.J.S.A. § 9:2-4(c) . . . . As important, the Amended Complaint includes new requests . . . to prohibit enforcement of N.J.S.A. § 9:2-4(c) in divorce proceedings, and to stay his family court proceedings in state court. As to these requests for relief and their accompanying allegations, the District Court lacks subject matter jurisdiction under *Rooker– Feldman* as clarified by *Exxon Mobil*."); *Wagner v. Dist. Att'y*, No. 11-762, 2012 WL 2090093, at *5 (W.D. Pa. R&R May 21, 2012) ("Plaintiff is not challenging through this civil rights action

the constitutionality or adequacy of the Pennsylvania DNA testing procedures. Rather, he claims

that Defendant, as well as the state courts he has sought to obtain relief from, have refused, in

violation of his constitutional rights, to provide him with the DNA evidence he seeks."), *adopted*,

2012 WL 2089799 (W.D. Pa. June 8, 2012).

Moreover, in fact, Mr. Mikhail cannot bring a claim for true declaratory relief—i.e., to

declare Pennsylvania's Protection from Abuse Act, 23 Pa. Cons. Stat. Ann. §§ 6101–6122,

unconstitutional—against the Defendants he has named. Where judges act as adjudicators, as

here, they are not the proper defendants in a § 1983 suit challenging the constitutionality of a

statute. *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 198-200 (3d Cir. 2000).[13]

\*     \*     \*

Not all of Mr. Mikhail's PFA proceedings–based claims are barred by *Rooker–Feldman*.

Of course, any harms caused by Ms. Kahn and her attorneys, such as fraud upon the court or

malicious prosecution, for example, are not barred by *Rooker–Feldman* because they are not

---

[13] *See also Pulliam v. Allen*, 466 U.S. 522, 538 n.18 (1984) ("Article III also imposes
limitations on the availability of injunctive relief against a judge. *See In re Justices of Supreme
Court of Puerto Rico*, 695 F.2d 17, 21 ([1st Cir.] 1982) (no case or controversy between a judge
who adjudicates claims under a statute and a litigant who attacks the constitutionality of the
statute). *See also Los Angeles v. Lyons*, 461 U.S. 95 (1983) (claims for injunctive relief against
unconstitutional state practice too speculative).").

Furthermore, Mr. Mikhail may well lack standing to bring a claim for declaratory relief now
that he is no longer subject to any PFA orders. *Cf., e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 495-
96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy
regarding injunctive relief, however, if unaccompanied by any continuing, present adverse
effects."); *Howell v. Young*, 530 F. App'x 98, 100-01 (3d Cir. 2013) (per curiam) ("To the extent
that Howell asserts a facial attack on [the statute], arguing that the statute as written violates
constitutional due process, he lacks standing. *See Mosby v. Ligon*, 418 F.3d 927, 933–34 (8th
Cir. 2005) (holding that plaintiff lacked standing to bring facial challenge when as-applied
challenge was barred by the *Rooker–Feldman* doctrine)." (footnote omitted)), *cert. denied*, 134
S. Ct. 427 (2013); *Williams v. Rappeport*, 699 F. Supp. 501, 508 (D. Md. 1988), *aff'd sub nom.
Williams v. Dvoskin*, 879 F.2d 863 (4th Cir. 1989).

caused by any state court judgment (although the fact that they are not barred by *Rooker–Feldman* does not mean that they survive, as discussed below).[14]

Further, Mr. Mikhail's 42 U.S.C. § 1983 conspiracy claim is not barred. As the Third Circuit Court of Appeals explained in *Great Western Mining & Mineral Co.*, "Regardless of the merits of the state-court decisions, if [the plaintiff] could prove the existence of a conspiracy to reach a predetermined outcome in state court, it could recover nominal damages for this due process violation." 615 F.3d at 173. If Mr. Mikhail can show that the Defendants conspired against him in such a way, he will have shown that he has been deprived the right to an impartial forum—an independent right giving rise to an independent claim that does not directly attack the state court judgments per se. *See id.* at 172. In the case of such a conspiracy, "the source of [Mr. Mikhail's] purported injury" would be "the actions of Defendants and members of the Pennsylvania judiciary, not the state-court decisions themselves." *Id.* And for the same reason, to the extent that Mr. Mikhail can show a constitutional violation on part of the Defendants who served in court-appointed roles (Drs. Lustig and Pisa and Ms. Sobel), such as a denial of due process, those claims might not be barred by *Rooker–Feldman*, either. *See, e.g.*, *Marran v. Marran*, 376 F.3d 143, 154 (3d Cir. 2004) ("[A] finding that the Montgomery County defendants violated Librett's or [R]'s substantive due process rights in investigating the allegations of abuse would not require a finding that the Court of Common Pleas erred in relying on the report stemming from the investigation. . . ."); *Ludwig v. Berks County*, 313 F. App'x 479, 482 (3d Cir.

---

[14] By contrast, of course, any claim that the state court erred in its denial of Mr. Mikhail's January 7, 2011 "Petition for Contempt," in which he attempted to "show[] that the PFA was secured through Fraud upon the Court," Compl. ¶ 31 ("this petition was dismissed by Judge Haaz," Comp. ¶ 33), is barred by *Rooker–Feldman*. That bar does not mean that his claim of fraud by Ms. Kahn and her attorneys is also barred by *Rooker–Feldman*, because this claim is "independent, even [though] it asks the federal court to deny a legal conclusion reached by the state court," *see Great W. Mining & Mineral Co.*, 615 F.3d at 167, but, for other reasons discussed below, such claims must nonetheless be dismissed.

2008) (per curiam) ("[A] finding that Drs. Ring and Rotenberg, Meyers, Ullman, and Mark violated Ludwig's due process rights would not require a finding that the state court erred in relying on their reports. As in *Marran*, such a determination may have an effect on the custody determination, but *Rooker–Feldman* is not implicated.").

### 2.   Whether *Rooker* or *Younger* Applies to Custody Proceedings

If *Rooker–Feldman* were to apply to the state court custody proceedings in this case, its application would be similar to that outlined above for PFA proceedings–based harms. Those harms flowing from the orders themselves would be barred from consideration here,[15] and the Court would likewise be without power to "[i]ssue declaratory relief on the Constitutionality of depriving Child of a Parent without justification" or "declaratory relief on not restricting a U.S. citizen from freely traveling within the U.S. and abroad without justification or any evidence to support such ruling." Compl. at 46. And, indeed, the Third Circuit Court of Appeals has upheld *Rooker–Feldman* dismissals of claims challenging custody orders.[16]

---

[15] *See, e.g.*, Compl. ¶ 58 (complaining of the court's "giving Ms. Kahn full custody of Child *Ex Parte*"); Compl. ¶ 85 (complaining of the court's "[e]ntering a custody order that is totally deficient, biased, and ignoring all the evidences presented at the hearing"); Compl. ¶ 88 (complaining of the court's "[g]iving physical custody of Child to Ms. Kahn and harassing Plaintiff only because Judge Haaz is Jewish and he was protecting Ms. Kahn, who is Jewish").

[16] *See, e.g.*, *Marran v. Marran*, 376 F.3d 143, 151 (3d Cir. 2004) ("Even assuming that it is true that no modification of the custody order would occur because of an injunction or an award of damages, granting an injunction or award of damages against Marran would require this Court to find that the Court of Common Pleas erred in finding that the abuse allegations were unfounded. *Rooker–Feldman* bars all of Librett's claims against Marran."). *But see infra* note 18. Most such decisions are reported in nonprecedential, per curiam opinions. *See Young*, 411 F. App'x at 458; *Lustig*, 313 F. App'x at 481; *McKnight*, 244 F. App'x at 444-45; *Kwasnik*, 228 F. App'x at 240-41; *see also, e.g.*, *Williams v. Moore*, No. 12-2005, 2012 WL 5499877, at *3 (D.N.J. Nov. 9, 2012) ("[T]he Third Circuit has consistently affirmed district court determinations that the *Rooker–Feldman* doctrine prohibits suits brought in federal court, pursuant to Section 1983, where plaintiffs challenge the judgments of state family courts." (citing nonprecedential cases)).

But the Third Circuit Court of Appeals' application of *Rooker–Feldman*, as opposed to *Younger* abstention, to child custody orders may be puzzling. In its primary precedential opinion on the matter, *Marran v. Marran*, 376 F.3d 143, 151 (3d Cir. 2004), the Third Circuit Court of Appeals explicitly noted "that litigation regarding custody is still ongoing in the state court," *id.* at 155, yet it applied *Rooker–Feldman*. *Cf. Coggeshall v. Mass. Bd. of Registration of Psychologists*, 604 F.3d 658, 664 (1st Cir. 2010) ("Here, the state-court proceedings had not yet ended, so the *Rooker–Feldman* doctrine was inapposite. The district court's other rationale for dismissing these claims is more persuasive. This rationale involves the *Younger* abstention doctrine." (footnote omitted)); *Nicholson v. Shafe*, 558 F.3d 1266, 1279 (11th Cir. 2009) ("[W]e agree with our sister circuits (the First, Eighth and Tenth Circuits) and hold that state proceedings have not ended for purposes of *Rooker–Feldman* when an appeal from the state court judgment remains pending at the time the plaintiff commences the federal court action that complains of injuries caused by the state court judgment and invites review and rejection of that judgment.").

Just a year before *Marran*, in *Anthony v. Council*, 316 F.3d 412 (3d Cir. 2003), the Third Circuit Court of Appeals held that "the particular nature of child support orders" required the application of *Younger* abstention even though the plaintiffs under those orders may not be "currently appearing or scheduled to appear in any particular child support hearing." *Id.* at 419.

The *Anthony* Court reasoned:

> Each plaintiff here is under a child support order. Each order requires
> continual involvement by the New Jersey courts. Under New Jersey law, parents
> are obligated to provide support until a child is emancipated. *Newburgh v. Arrigo*,
> 443 A.2d 1031, 1037 (N.J. 1982). As such, plaintiffs have been, and will remain,
> under their child support orders for many years. Throughout the duration of the
> order, the New Jersey courts are charged with monitoring, enforcing and
> modifying the child support obligations. *See* N.J. Stat. Ann. § 2A:17–56.9a
> (providing for review and modification of child support orders); N.J.R. 5:7–5

> (providing for monitoring and enforcement of child support orders, including the institution of contempt hearings if obligors fail to make payments); N.J.R. 5:25–3 (explaining the jurisdiction, duties, powers and responsibilities of Child Support Hearing Officers). As is apparent, the New Jersey courts have performed their delegated functions with respect to plaintiffs' child support orders.
>
> Plaintiffs contend that, because they are not currently appearing or scheduled to appear in any particular child support hearing, including a contempt hearing, there is no "ongoing" or "pending" proceeding. This argument may carry weight in other types of suits. But given plaintiffs' specific claims here and the particular nature of child support orders, the argument is unavailing.

*Id.* (footnotes omitted).

Of course, it cannot be gainsaid that where custody proceedings are *actually* underway, *Younger* rather than *Rooker* applies (as opposed to when they are conceptually underway, as under the *Anthony* Court's reasoning). *See generally Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010) ("The state court actions regarding the registration of the French orders were pending when Lazaridis filed his federal court complaint on December 27, 2006, satisfying [*Younger*'s] first prong."). But *Anthony*'s more inclusive logic, that *Younger* rather than *Rooker* should generally—conceptually speaking—apply to child support adjudication, would seem to be just as strong in the custody context.[17] Thus, "[i]t is reasonable to conclude that custody proceedings must also be viewed as a whole, rather than as individual, [discrete] hearings." *Stefanov v. Ross*, No. 12-0472, 2013 WL 3754819, at *5 (M.D. Pa. July 15, 2013) (citing *Anthony*, 316 F.3d at 420-21).

---

[17] The *Anthony* Court did not assert the converse, i.e., that *Rooker–Feldman* could not apply to child support hearings. Rather, it stated: "Similarly, the Rooker–Feldman doctrine restricts lower federal court review of state-court judgments and evaluation of constitutional claims that are 'inextricably intertwined with the state court's [decision] in a judicial proceeding.' Because here we affirm abstention under *Younger*, we do not address whether the Rooker–Feldman doctrine applies." *Anthony*, 316 F.3d at 420 n.10 (quoting *Feldman*, 460 U.S. at 483 n.16; citing *Rooker*, 263 U.S. 413); *see also, e.g.*, *Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth. of N.Y. & N.J. Police Dep't*, 973 F.2d 169, 177 (3d Cir. 1992). This is consistent with the material in note 18, *infra*.

Indeed, the Pennsylvania Superior Court has repeatedly stated that

> [c]hild custody orders are temporary in nature and always subject to change if new circumstances affect the welfare of a child. The Commonwealth has a duty of paramount importance, to protect the child's best interests and welfare. To that end, it may always entertain an application for modification and adjustment of custodial rights.

*Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. Ct. 2004) (citation omitted). Accordingly, Pennsylvania courts are not bound by previous custody orders. *See id.*; 23 Pa. Cons. Stat. Ann. § 5338(a) ("Upon petition, a court may modify a custody order to serve the best interest of the child."); 23 Pa. Cons. Stat. Ann. § 5323 ("The court may issue an interim award of custody . . . ."); *cf.* 23 Pa. Cons. Stat. Ann. § 5422 ("[A] court of this Commonwealth which has made a child custody determination consistent with section 5421 (relating to initial child custody jurisdiction) or 5423 (relating to jurisdiction to modify determination) has exclusive, continuing jurisdiction over the determination . . . ."). Thus, although certain orders in custody cases are interlocutory and others are final for purposes of appealability through the Pennsylvania courts, *see Kassam v. Kassam*, 811 A.2d 1023, 1025-28 (Pa. Super. Ct. 2002), Pennsylvania courts "recognize the uniqueness of custody orders compared to orders in other civil actions," *id.* at 1025; *see also, e.g.*, *Holler v. Smith*, 928 A.2d 330, 331-32 (Pa. Super. Ct. 2007) ("Custody matters are a special creature. . . . Unlike other actions which have a clear beginning, middle, and end, custody orders may be repeatedly modified."); *Friedman v. Friedman*, 307 A.2d 292, 295 (Pa. Super. Ct. 1973) ("Unlike other judgments or decrees, an order of custody is a unique and delicate matter. It is never final, but is considered temporary in nature, subject to constant review and modification. Because the State has a duty to protect the children's best interests and welfare it may always entertain an application for modification and adjustment of custodial rights.").

Furthermore, the proposition that a federal court considering whether *Rooker–Feldman* or *Younger* applies should have to wade into the morass of determining whether a particular child

custody order was final, when such proceedings by their very nature are always and necessarily provisional, given the obligation to continue to assess a child's possibly changing needs, *cf. Anthony*, 316 F.3d at 419-20, and the Pennsylvania courts have their own rules for finality and appealability, is patently absurd. And again, viewed more broadly, the very structure of child custody proceedings makes one wonder why *Rooker–Feldman* should apply when an upset parent, like Mr. Mikhail here, can simply petition the Pennsylvania court at any time to modify its custody order and, after those particular proceedings have moved far enough along, seek to appeal to the Pennsylvania Superior Court.

For these reasons, and because Third Circuit case law does not explicitly state that *Rooker–Feldman*, rather than *Younger* abstention, must apply to child custody proceedings,[18]

---

[18] Of the relevant decisions cited, only *Marran*, 375 F.3d 143, is precedential. And *Marran* does not preclude this Court from applying *Younger*, rather than *Rooker–Feldman*, to child custody proceedings (nor would the nonprecedential opinions do so, *see supra* note 16, even if they were precedential). The conclusion that *Rooker–Feldman* must always be applied to child custody orders, even where the proceedings are ongoing, would require the predicate conclusion that as a matter of law the *Rooker–Feldman* doctrine and *Younger* abstention are mutually exclusive. They may or may not be, but that question would be difficult to resolve, indeed, especially with regard to state proceedings—such as custody proceedings—in which the court issues orders but the case nonetheless continues (as discussed in the main). Further, the *Marran* Court's focus in its *Younger* discussion was not the custody proceedings, but rather "the adequacy of [the Montgomery County Office of Children and Youth's] investigation," with regard to which "there are no ongoing state proceedings," such that "*Younger* abstention [was] inappropriate." *Id.*

Perhaps the proposition of applying *Rooker–Feldman* rather than *Younger* emanates from the facts that *Rooker–Feldman* is jurisdictional, whereas *Younger* is not, and that jurisdictional questions must be resolved first. *See Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590-91 (2013) (noting that *Younger* abstention is an exception to cases in which, "jurisdiction exist[s]," because "a federal court's obligation to hear and decide a case is virtually unflagging" (citations and internal quotation marks omitted)). That conclusion would not necessarily be true, even if the predicate, namely, that jurisdiction comes first, is: Lower federal courts lack jurisdiction under *Rooker–Feldman* precisely *because*, inter alia, the relevant state court judgments are final. If the judgments are *not* final, as with child custody proceedings that are actually—or, as this Court holds, also at least conceptually—ongoing, then *Rooker–Feldman* is technically no bar at all, and there is no logically antecedent jurisdictional problem; or, alternatively, *Rooker–Feldman* might bar only those orders that have already been entered without applying to claims

for prospective or declaratory relief that might somehow avoid *Rooker–Feldman* dismissal. If this latter logic applies, then, in ongoing proceedings in which orders have been entered, *Younger* abstention should provide broader grounds—that is, require abstention from more claims—than *Rooker–Feldman* (except, perhaps, in that *Younger* may not apply to damages claims, but any claims of damages from harms resulting from the judgments, the only damages claims barred by *Rooker–Feldman* anyway, will likely be barred by absolute judicial immunity); in turn, under the rule of analysis that jurisdiction comes first, *Rooker–Feldman* should technically be applied first, and then *Younger*. But because all those claims that *Rooker–Feldman* would bar would *also* be barred by *Younger*, performing the analysis in that order would be little more than an academic exercise—and ironically so, given the purpose of both doctrines. *Cf., e.g.*, *Estes v. Gaston*, No. 12-1853, 2012 WL 5839490, at *4 (D. Nev. Nov. 16, 2012) ("It is not entirely clear if plaintiff seeks this court to enjoin an ongoing state court proceeding, a final judgment by a state court, or both. Ultimately, it does not matter. To the extent the proceeding is ongoing then this court abstains pursuant to *Younger* and *Juidice.* To the extent plaintiff wants this court to overturn a final state court decision then the *Rooker–Feldman* doctrine precludes review by this court.").

A more practical approach would seem warranted. And the fact that child custody orders are provisional, temporary, readily modified, and, in a word, conceptually "ongoing," as discussed above, that approach should be to apply principles of *Younger* abstention. Of course, there is a further wrinkle, namely, that *Younger* may or may not apply to damages claims, *see infra* note 22, and accompanying text, but to the extent that damages are not available in the ongoing state proceedings, and thus potentially not barred by *Younger*, they may also not be barred by *Rooker–Feldman*, either; and inasmuch as those damages claims actually attack the temporary orders themselves, and should be *stayed* (rather than allowed to proceed) under *Younger*, *see, e.g.*, *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 809 (3d Cir. 2010), it would seem that they would ultimately have to be dismissed, years later, when the custody proceedings terminate (and the orders really *are* final). Indeed, to reach some theoretical accommodation, it might even be held that *Younger* could apply to *these particular* claims for damages based on orders, whether based on principles of federalism or by categorical incorporation of *Rooker–Feldman* in these narrow circumstances.

In any case, there is yet another reason for revisiting *Marran*'s implication that *Rooker* is properly applied to child custody proceedings, especially those that are ongoing: *Exxon Mobil*'s clarification of *Rooker–Feldman* and the Third Circuit's and others' reformulation of the proper test. In upholding the district court's dismissal of certain claims under *Rooker–Feldman*, the *Marran* Court explained that "the claims [were] inextricably intertwined with the state court adjudication." *Id.* at 151. But as the Third Circuit Court of Appeals has explained since *Exxon Mobil*:

> In light of [the Supreme Court's] admonition, we have recognized that caution is now appropriate in relying on our pre-*Exxon* formulation of the *Rooker–Feldman* doctrine, which focused on whether the state and federal suits were "inextricably intertwined." . . . The Court deliberately did not rely on this formulation in its jurisdictional analysis, instead employing the four-part inquiry that we have outlined above. Although the term "inextricably intertwined" was used twice by the Supreme Court in *Feldman,* reliance on this term has caused lower federal

28

this Court will evaluate Mr. Mikhail's custody proceedings–based harms for purposes of

---

> courts to apply *Rooker–Feldman* too broadly. The phrase "inextricably intertwined" does not create an additional legal test or expand the scope of *Rooker–Feldman* beyond challenges to state-court judgments. When a federal plaintiff brings a claim, whether or not raised in state court, that asserts injury caused by a state-court judgment and seeks review and reversal of that judgment, the federal claim is "inextricably intertwined" with the state judgment. The phrase "inextricably intertwined," however, has no independent content. It is simply a descriptive label attached to claims that meet the requirements outlined in *Exxon Mobil.*

*Great W. Mining & Mineral Co.*, 615 F.3d at 169-70 (citations and internal quotation marks omitted).

For this further reason, it appears that *Marran*'s conceptual underpinnings may no longer support some of its more material holdings under *Rooker–Feldman*. For instance, the *Marran* Court held that

> Librett's claims against Marran present the most straightforward application of *Rooker–Feldman*. Librett seeks damages for breach of fiduciary duty, breach of implied contract, intentional infliction of emotional distress, and "loss of earnings during minority." All of these claims are based on the alleged abuse of R[]. In order for Librett to succeed on these claims, the District Court would have to find that the Court of Common Pleas erred in deciding that the allegations of abuse were unfounded. As such, the claims are inextricably intertwined with the state court adjudication and the District Court was correct in finding it lacked jurisdiction over these claims.

*Marran*, 376 F.3d at 151. But following *Exxon Mobil*, the Third Circuit Court of Appeals adopted a hypothetical, first posed by the Second Circuit Court of Appeals, to explain a fact pattern in which *Rooker–Feldman* would *not* apply:

> Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging *injury based on the employer's discrimination*. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker–Feldman*, of the state-court judgment.

*Great W. Mining & Mineral Co.*, 615 F.3d at 167 (quoting *Hoblock*, 422 F.3d at 87-88) (emphasis in *Great W. Mining & Mineral Co.*). It would seem that Librett's claims of harm by Marran, on the allegation that Marran had abused R., would, on the logic of *Great Western Mining & Mineral Co.*'s hypothetical, not be barred by *Rooker–Feldman* (the applicability of res judicata, of course, is another matter). And so, as observed above, such damages claims might not be barred by either *Rooker–Feldman* or *Younger*, but still, for the reasons articulated, *Younger* seems the doctrine more appropriately applied.

*Younger* abstention rather than for the question of whether *Rooker–Feldman* applies. *See, e.g.*, *Wattie-Bey v. Att'y Gen.'s Office*, 424 F. App'x 95, 96 (3d Cir. 2011) (per curiam) ("The District Court was correct that *Younger* abstention principles dictated dismissal of the complaint, at least with regard to appellants' claims for prospective injunctive and declaratory relief based on alleged violations of their constitutional rights in the ongoing state court custody proceedings."). Moreover, Mr. Mikhail's Complaint itself indicates that the custody proceedings here are actually, and not only conceptually, ongoing. *See* Compl. ¶ 2 ("On December 1st, 2009, Ms. Kahn initiated *what will be a very contentious divorce and custody*." (emphasis added)); Compl. ¶ 96 (allegation against a judge for "not scheduling a hearing for Plaintiff petition to modify custody that was filed April 2013"); Compl. ¶ 160 ("the custody matter is still pending"). The docket of the Montgomery Court of Common Pleas, of which this Court takes judicial notice, and which is attached as an exhibit to the Judges' Motion to Dismiss, *see* Judges' Mot. Dismiss Ex. 2 (Doc. No. 18-3), confirms that this case is still open and ongoing.[19]

### B.    *Younger* Abstention

As the discussion above suggests, child custody proceedings are a strong candidate for *Younger* abstention. *Younger* abstention is not a jurisdictional principle, but rather a doctrine first announced in the Supreme Court's *Younger v. Harris* opinion, in the context of preventing federal courts from interfering with ongoing state criminal proceedings. As such, it is grounded in "Our Federalism," or the concept of "a system in which there is sensitivity to the legitimate

---

[19] On the authority to take judicial notice, see *infra* note 36. Although its entries are sealed, the docket in Mr. Mikhail's state court proceedings shows that the divorce and custody dispute continues in full force, with the last filing on December 31, 2013, and the case is marked "OPEN." *See* No. 2009-41614 (Montgomery Cnty. Ct. Com. Pl. Dec. 4, 2013) (go to http://webapp.montcopa.org/PSI and search by docket number).

interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger*, 401 U.S. at 44. Under *Younger*, federal courts will abstain from, and therefore dismiss, claims otherwise within the scope of federal jurisdiction when "exceptional circumstances . . . justify a federal court's refusal to decide a case in deference to the States." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013) (citation omitted).

These exceptional circumstances are present in only three types of cases: "ongoing state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.* (ellipsis in original) (citations omitted). The third category, the only potentially applicable to the custody and divorce proceedings at issue here, requires that the state's interest in maintaining the proceeding in question uninterrupted by the federal judiciary be "of sufficiently great import." *Juidice v. Vail*, 430 U.S. 327, 335 (1977). But in cases in which *Younger*'s requirements are met, our Court of Appeals has instructed, "district courts *must* abstain from exercising jurisdiction over a particular claim where resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding." *Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010) (emphasis added). This rule is consistent with the Supreme Court's exhortation that "federal courts *should* abstain from interfering with the ongoing proceedings" where the *Younger* doctrine applies. *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 437 (1982) (emphasis added).

The Third Circuit Court of Appeals endeavors to demarcate the metes and bounds of this "elusive" doctrine by explaining that for it to apply

> (1) there must be ongoing state proceedings that are judicial in nature; (2) the state proceedings must implicate important state interests; and (3) the state proceedings must afford an adequate opportunity to raise federal claims. Even if the necessary three predicates exist, however, *Younger* abstention is not appropriate if the federal plaintiff can establish that (1) the state proceedings are being undertaken in bad faith or for purposes of harassment or (2) some other extraordinary circumstances exist such that deference to the state proceeding will present a significant and immediate potential for irreparable harm to the federal interests asserted.

*Anthony*, 316 F.3d at 418 (alterations omitted) (quoting *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989)). The Third Circuit's *Anthony* case both lays out the standard as well as makes clear why *Younger* applies to the custody proceedings–based claims in this case.

### 1. Ongoing State Proceedings

First, as discussed above, the Kahn-Mikhail child custody proceedings are ongoing, and so *Younger*'s first prong is satisfied. *See supra* subsection III.A.2. As the *Anthony* Court explained, New Jersey child support proceedings form part of "a comprehensive and fluid system designed to address the ever-present and ever-changing realities of child support orders" such that, for purposes of *Younger* analysis, they "must be viewed as a whole, rather than as individual, discrete hearings." 316 F.3d at 420-21. The child custody proceedings ongoing here, too, must be viewed in the same way. As the Pennsylvania Supreme Court has explained,

> The language of the statutory sections is plain and unambiguous; the words allow for modification of any existing custody order *any time* the best interest of the child requires such. . . .  [T]hough we share the Superior Court's concern over the possibility of spurious petitions for modification from partial to shared custody orders, we must be mindful of the dynamism of the process of growth and maturity of children, as well as the circumstances of their parents' lives, where the only constant is change. These are factors which may require continuing review of the best interest of the child, and demand a degree of flexibility such as would allow the court the discretion to make necessary changes when the best interest of the child require such. . . . Consequently, we hold that a petition for modification of a partial custody to shared custody order requires the court to inquire into the best interest of the child regardless of whether a "substantial" change in circumstances has been shown.

*Karis v. Karis*, 544 A.2d 1328, 1331-32 (Pa. 1988).

## 2.   Important State Interests in Custody Proceedings

Second, there can be no quarrel with the notion that child custody proceedings implicate

important state interests. Because "[f]amily relations are a traditional area of state concern,"

*Moore v. Sims*, 442 U.S. 415, 435 (1979); *accord Lazaridis*, 591 F.3d at 671 & n.5; *Wattie-Bey*,

424 F. App'x at 97, "[t]he Supreme Court has expanded the applicability of *Younger* to . . . a

state child custody action," *Malachowski v. City of Keene*, 787 F.2d 704, 708 (1st Cir. 1986) (per

curiam) (citing *Moore*, 442 U.S. 415), which "is precisely the type of case suited to *Younger*

abstention, as the state proceeding implicates the important state interest of preserving the state's

judicial system." *Lazaridis*, 591 F.3d at 671.[20]

> What Mr. Mikhail
>
> essentially wants [is] wholesale federal intervention into a state dispute. He seeks the vacation of existing orders and a federal injunction directing future litigation. Were the District Court to grant this relief, it could "readily be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975).

*Lazaridis*, 591 F.3d at 671. The *Younger* doctrine "seeks to avoid" this suggestion that state

courts cannot enforce constitutional principles—as well as the concomitant necessity of

"monitor[ing] and enforc[ing] the state courts' compliance with a federal order"—and instead

expects "plaintiffs [to] raise [their issues] in their own cases currently pending in the [state]

---

[20] *See also, e.g.*, *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613-14 (9th Cir. 2000); *Parker v. Turner*, 626 F.2d 1, 4 & n.7 (6th Cir. 1980); *cf. Ex parte Burrus*, 136 U.S. 586, 593-94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States. As to the right to the control and possession of this child, as it is contested by its father and its grandfather, it is one in regard to which neither the congress of the United States, nor any authority of the United States, has any special jurisdiction. Whether the one or the other is entitled to the possession does not depend upon any act of congress, or any treaty of the United States or its constitution.").

Because some of the Defendants appear to have attempted to raise what appear to be "domestic relations" defenses, the Court notes that the "domestic relations exception" these Defendants were contemplating applies to federal diversity cases, not federal question cases, such as the instant litigation. *See Wattie-Bey*, 424 F. App'x at 96 n.1.

courts." *Anthony*, 316 F.3d at 421 (citations omitted) (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)). Such intervention "is not the proper business of the federal judiciary." *H.C. ex rel. Gordon v. Koppel*, 203 F.3d 610, 613-14 (9th Cir. 2000).

### 3.   Adequate Opportunity to Raise Federal Claims

Finally, there is no suggestion that Mr. Mikhail could not have raised his constitutional claims in the state court proceedings. "[T]he burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims,'" *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (alteration in original) (quoting *Moore*, 442 U.S. at 432), and the plaintiff cannot carry this burden simply by asserting "that state or Commonwealth courts may reject (or have rejected) arguments on the merits," *Duty Free Shop, Inc. v. Administracion de Terrenos de Puerto Rico*, 889 F.2d 1181, 1183 (1st Cir. 1989) (Breyer, J.) (citing cases). "So long as a plaintiff is not barred on procedural or technical grounds from raising alleged constitutional infirmities, it cannot be said that state court review of constitutional claims is inadequate for *Younger* purposes." *Hansel v. Town Court for Town of Springfield*, 56 F.3d 391, 394 (2d Cir. 1995); *see also, e.g.*, *Huffman*, 420 U.S. 592, 610 (1975) ("[T]he considerations of comity and federalism which underlie *Younger* permit no truncation of the exhaustion requirement merely because the losing party in the state court of general jurisdiction believes that his chances of success on appeal are not auspicious."); *Moore*, 442 U.S. at 430-31 & n.13. Absent some showing of a procedural defect, the presumption is that "[s]tate courts are every bit as competent to deal with the [plaintiff's] claims . . .  as are the federal courts and this, of course, includes the ability to address claims under both the State constitution and the Federal constitution." *Lui v. Comm'n on Adult Entm't Establishments*, 369 F.3d 319, 326 (3d Cir. 2004).

Mr. Mikhail was and remains free to raise the substance of his claims for injunctive relief before the state court sitting to address custody issues. However, it is quite likely that he could

not raise claims for damages, and so these claims will not be barred by *Younger*, and will be

considered later in this Opinion under another challenge. There is no bar in custody proceedings

to a parent's raising his federal constitutional rights. In fact, Pennsylvania courts have

entertained such claims in custody cases. *See, e.g.*, *Schmehl v. Wegelin*, 927 A.2d 183, 187 (Pa.

2007) (considering an equal protection challenge); *Everett v. Parker*, 889 A.2d 578, 580 (Pa.

Super. Ct. 2005) (addressing a due process challenge); *Luminella v. Marcocci*, 814 A.2d 711 (Pa.

Super. Ct. 2002) (considering a Fourth Amendment privacy claim); *Jackson v. Garland*, 622

A.2d 969, 971 (Pa. Super. Ct. 1993) (addressing Fourteenth Amendment familial relations liberty

interest).

### 4. No Exception to *Younger* Applies Here

One *Younger*-related question remains.

> Even when these [three *Younger*] requirements are met, it is inappropriate to
> abstain . . . if the plaintiff establishes that "(1) the state proceedings are being
> undertaken in bad faith or for purposes of harassment or (2) some other
> extraordinary circumstances exist, such as proceedings pursuant to a flagrantly
> unconstitutional statute, such that deference to the state proceeding will present a
> significant and immediate potential for irreparable harm to the federal interests
> asserted." *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989) (citing *Middlesex*
> *County Ethics Comm.*, 457 U.S. at 435).

*Getson v. New Jersey*, 352 F. App'x 749, 753 (3d Cir. 2009); *see also Williams v. Gov't of V.I.*

*Bd. of Med. Examiners*, 360 F. App'x 297, 299-300 (3d Cir. 2010). Mr. Mikhail's contentions

make clear that he thinks *Younger* does not apply, and that he believes the defendant judges have

conspired with the other Defendants to deprive him of his federal constitutional rights, or that

they have discriminated against him "because of [his] race, gender, [and] religion." Compl.

¶¶ 218, 239. But these allegations are conclusory, as explained in greater detail below. *See also*

*infra* subsection III.D.2. "[A] plaintiff seeking to avoid *Younger* must affirmatively demonstrate

the justification for application of an exception"; thus, "[m]ere conclusory allegations of bias are

insufficient to overcome *Younger*" abstention. *Kirschner v. Klemons*, 225 F.3d 227, 236 (2d Cir. 2000).

First, it is apparent that there are no sufficient allegations (let alone a showing) of bad faith here. It is not enough that a private litigant undertakes the state court proceedings in bad faith. Even leaving to one side the fact that it is implausible that a mother's desire, such as Ms. Kahn's, to pursue a divorce and seek custody of her child could constitute actions taken in bad faith, the bad faith exception contemplates a situation in which the state court proceeding in question is "only one of a series of repeated *prosecutions* to which [federal plaintiff] will be subjected," *Younger*, 401 U.S. at 49 (emphasis added); *accord Schlagler v. Phillips*, 166 F.3d 439, 442 (2d Cir. 1999), or perhaps where the tribunal itself acts in bad faith or bias (an "extraordinary circumstance," as discussed below). By contrast, "[a] state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception." *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 199 (2d Cir. 2002); *see also, e.g.*, *Kirschner*, 225 F.3d at 237. But, as discussed more extensively with regard to Mr. Mikhail's allegations of conspiracy against the Judges, *see infra* subsection III.D.2, there is hardly enough to suggest such bad faith on their part.

The bad faith doctrine is narrow in still other ways relevant here. For instance, "[a] prosecution or proceeding is conducted in bad faith for abstention purposes when it is brought without hope of success," *Getson*, 352 F. App'x at 753-54 (citations and internal quotation marks omitted). Mr. Mikhail's Complaint demonstrates that his soon-to-be-ex-wife, Ms. Kahn, has, in fact, been successful in seeking custody, so that it cannot be said that her wading into litigation against Mr. Mikhail is without legitimacy, or, "in bad faith."

Nor is there enough here to suggest that any extraordinary circumstances exist. "The Supreme Court has stated that 'such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation,'" such that the state court is "'incapable of fairly and fully adjudicating the federal issues before it.'" *Getson*, 352 F. App'x at 754 (quoting *Kugler v. Helfant*, 421 U.S. 117, 124-25 (1975)). The Supreme Court has described only two such circumstances, *see Diamond "D" Constr. Corp.*, 282 F.3d at 201: first, when a statute is "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it," *Younger*, 401 U.S. at 53-54—clearly not the case here—and second, when the state tribunal "was incompetent by reason of bias to adjudicate the issues pending before it," *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973).

But Mr. Mikhail cannot shoehorn his claims into this second extraordinary circumstances exception, either. It is true that "[j]udicial bias is a recognized basis for derailing *Younger* abstention, *see, e.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 577-79 (1973), but the claim requires more than the frenzied brandishing of a cardboard sword." *Brooks v. N.H. Supreme Court*, 80 F.3d 633, 639-40 (1st Cir. 1996). In the leading case, *Kugler v. Helfant*, 421 U.S. 117, the Supreme Court held that the plaintiff, a New Jersey municipal court judge seeking to enjoin criminal proceedings against him after, as he claimed, he had been forced by justices of the New Jersey Supreme Court to testify before a grand jury in violation of his Fifth Amendment rights, had not borne his burden of showing that those justices' involvement sufficed. *See Kugler*, 421 U.S. at 124-27. "Helfant does not allege, and it certainly cannot be assumed, that no trial judge in New Jersey will be capable of impartially deciding his case simply because of the alleged

previous involvement of members of the New Jersey Supreme Court," the Court reasoned. *Id.* at 127. "It is impossible to conclude . . . that the objectivity of the entire New Jersey court system has been irretrievably impaired so far as Helfant is concerned." *Id.*; *see also Getson*, 352 F. App'x at 754-55. To the extent that certain judges were biased, they could be disqualified, for instance. *See Kugler*, 421 U.S. at 127-28. And although the Supreme Court has not specifically said so, the First Circuit Court of Appeals, for instance, has explained that "the bias exception to the *Younger* abstention doctrine is inapposite if an ostensibly aggrieved party fails to employ available procedures for recusal of allegedly biased judges." *Brooks*, 80 F.3d at 640.

As the First Circuit Court of Appeals has further explained, "the baseline showing of bias necessary to trigger *Younger*'s escape mechanism requires the plaintiff to offer some evidence that abstention will jeopardize his due process right to an impartial adjudication." *Brooks*, 80 F.3d at 640 (citing *Gibson*, 411 U.S. at 577). But "claims of general institutional bias" alone will not do. Some actual showing of bias or prejudice must be made, *id.*, such as demonstrated "prejudgment of the facts or personal interest," *Gibson*, 411 U.S. at 578, or a "substantial pecuniary interest in [the] proceedings," *id.* at 579. *See also Brooks*, 80 F.3d at 640 (citing, inter alia, *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972)). Nor is his allegation of unconstitutional discrimination supported by any factual allegations. *See, e.g.*, *Johnson v. Phila. Hous. Auth.*, 448 F. App'x 190, 193 (3d Cir. 2011) (per curiam); *Massi v. City of Philadelphia*, No. 12-1309, 2013 WL 6388519, at *3 (E.D. Pa. Dec. 6, 2013) (citing cases).

Mr. Mikhail's allegations do not satisfy any of these tests. As discussed in further detail below, *see infra* subsection III.D.2, his allegations of conspiracy with or bribery of the defendant judges are wholly conclusory. In fact, some of his specific allegations show that at least some of the judges ruled in his favor on multiple instances, as by dismissing his child from the order

resulting from the first PFA petition, dismissing the third, fourth, and fifth PFA petitions, and (it seems, in all likelihood), discharging Dr. Lustig from the engagement. Nor is it enough merely to allege, without any factual support, that the "Judges engaged in an egregious discrimination against [him] in a divorce court because of race, gender, [and] religion," Compl. ¶¶ 218, 239. *See Massi*, 2013 WL 6388519, at *3 (citing cases).

Mr. Mikhail has not alleged any way in which any of the judges "stands to gain or lose depending" on the outcome of the state court proceedings, "nor has he revealed the existence of any particularized interest in the outcome of his litigation that might tend to undermine the [Judges'] impartiality." *Brooks*, 80 F.3d at 640. While Mr. Mikhail's factual allegations must be accepted as true at this stage of the case, "he must provide more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Getson*, 352 F. App'x at 755 (quoting *Iqbal*, 556 U.S. at 678). It goes without saying that the "'naked assertion of bias' [is] clearly insufficient to withstand [a] motion to dismiss." *Id.*; *see also, e.g.*, *Sheils v. Bucks Cnty. Domestic Relations Section*, 921 F. Supp. 2d 396, 412-13 (E.D. Pa. 2013); *Seguin v. Chafee*, No.12-0708, 2012 WL 6553621, at *6 (D.R.I. Dec. 14, 2012).

Instead, Mr. Mikhail must offer concrete allegations that "any individual [Judge] is actually biased or has prejudged his case." *Brooks*, 80 F.3d at 640. But the closest he gets to the goal in this respect—and not nearly close enough—is with regard to Ms. Sobel, the second court-appointed custody evaluator, who, he alleges, made certain statements that "insulted [Mr. Mikhail] in his faith" and selectively reported what others told her, *see* Compl. at 19-20. Neither allegation is sufficient to impugn the presumption of her impartiality or discretion in her role as custody evaluator, nor the impartiality of the presiding judge who appointed her. Mr. Mikhail here "bumps up against the historic presumption that judges are 'men [and women] of

conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' The presumption of judicial impartiality cannot be trumped by free-floating invective, unanchored to specific facts." *Brooks*, 80 F.3d at 640 (quoting *Withrow v. Larkin*, 421 U.S. 35, 55 (1975)) (alterations in *Brooks*); *cf. also, e.g.*, *Pulliam v. Allen*, 466 U.S. 522, 541 (1984) ("It no longer is proper to assume that a state court will not act to prevent a federal constitutional deprivation or that a state judge will be implicated in that deprivation.").

To find either *Younger* exception satisfied here would be to allow that exception to "swallow the *Younger* rule." *Schlagler*, 166 F.3d at 443. Mr. Mikhail has not alleged (at least not with any even barely sufficient specificity) any cognizable bad faith or extraordinary circumstances. Moreover, Mr. Mikhail can seek at any time to modify the custody order currently in force by petitioning in state court to modify it, and then seek review of any adverse rulings through the Pennsylvania appellate judiciary. This is what our system of federalism requires him to do, because this Court, except in exceptional and exceptionally rare circumstances, lacks the power to intervene in ongoing state custody proceedings.

*   *   *

Although *Younger* abstention is required, it remains to be seen *which* of Mr. Mikhail's custody- and/or divorce-based claims as he has framed them are actually barred by *Younger*.

On the one hand, Mr. Mikhail's requests for injunctive and declaratory relief are barred. "The *Younger* doctrine is as applicable to suits for declaratory relief as it is to those for injunctive relief; the Supreme Court held in a companion case to *Younger* that *Younger*'s policy would 'be frustrated as much by a declaratory judgment as it would be by an injunction.'" *Kirschner*, 225 F.3d at 235 (quoting *Samuels v. Mackell*, 401 U.S. 66, 73 (1971)); *accord Anthony*, 316 F.3d at 416, 419-20 (abstaining under *Younger* from addressing both retrospective

40

and prospective claims); *Wattie-Bey*, 424 F. App'x at 96; *see also, e.g.*, *Younger*, 401 U.S. at 41

n.2 ("[D]eclaratory relief is also improper when a prosecution involving the challenged statute is

pending in state court at the time the federal suit is initiated."); *Dongon v. Banar*, 363 F. App'x

153, 156 (3d Cir. 2010) (per curiam) ("Because it appears that state court proceedings are

pending or ongoing in [the] child support matter, it would be inappropriate for this Court to

interfere with the state's interest in administering its own family court."); *Sheils*, 921 F. Supp. 2d

at 413-14. Additionally, Mr. Mikhail's claims regarding Judge Carluccio's denial of his requests

for alimony *pendente lite* must also be dismissed, primarily under *Younger*, but alternatively

under *Rooker–Feldman*, based on the ongoing nature of the proceedings[21] or the finality of the

denial, respectively, whichever applies. In neither case is intervention by a federal court

appropriate.

On the other hand, *Younger* does not apply to the money damages claims in this case,

because regardless of whether it can ever be applied to damages claims,[22] "*Younger* abstention is

only appropriate where the precise claims raised in federal court are available in the ongoing

state proceedings," *Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399, 413 (3d

---

[21] *See supra* note 19 and accompanying text. The alimony *pendente lite* claim is not a damages claim, but even if it were, the relief was available in state court, so *Younger* abstention is not appropriate. *See infra* note 22.

[22] "The Supreme Court has never explicitly decided whether *Younger* abstention covers actions for damages as well as equitable relief. . . . [Other Supreme Court] cases seem to indicate that abstention under *Younger* principles is not proper when damages are sought." *Marran*, 376 F.3d at 154 (not deciding the issue); *accord Kirschner*, 225 F.3d at 238. *But see Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 809 (3d Cir. 2010) ("Plaintiffs' claims for damages and attorney fees against Defendants in their individual capacities, however, should have been stayed rather than dismissed."). The courts of appeals are split on the issue of whether damages claims should be dismissed under *Younger* (or whether they should be stayed, etc.). *E.g.*, *Deakins v. Monaghan*, 484 U.S. 193, 208 & n.3 (1988) ("In the absence of direction from this Court, it now appears that a plurality of the Circuits apply the *Younger* doctrine—in some fashion—to damages claims like respondents.'"); *Simpson v. Rowan*, 73 F.3d 134, 137-38 n.6 (7th Cir. 1995); *cf. Burlington Ins. Co. v. Panacorp, Inc.*, 758 F. Supp. 2d 1121, 1138 n.27 (D. Haw. 2010) (canvassing a split within the Ninth Circuit).

Cir. 2005); *accord Kirschner*, 225 F.3d at 238; *see Deakins v. Monaghan*, 484 U.S. 193, 201-03 (1988). Plainly, Mr. Mikhail could not and cannot seek compensatory or punitive damages based on some of the claims he has raised in the custody proceedings.

*   *   *

Both because *Younger* does not apply to the damages claims in this case and because both *Younger* and *Rooker–Feldman* do not apply to claims arising from alleged conspiracies with the defendant judges, the remainder of this Opinion focuses on several other grounds, some mutually supportive and some alternative, for dismissing the remainder of Mr. Mikhail's Complaint.

### B.   Claims Purportedly Brought Under 18 U.S.C. § 242 (Parts of Counts I & II)

As part of his federal claims, in addition to bringing suit under § 1983, Mr. Mikhail tries to invoke 18 U.S.C. § 242, a criminal statute.[23] He also seeks to compel Pennsylvania's Attorney General to prosecute the Defendants pursuant to § 242. That Mr. Mikhail, a private individual,

---

[23] The statute provides, in full:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

18 U.S.C. § 242.

cannot prosecute a criminal case or force the Commonwealth to do so (and in federal court, at that) would merit little discussion if not for the inescapable opportunity to explain the applicable law to a pro se litigant who so vigorously attempts to pursue several avenues of bringing criminal charges.

Charitably construed, Mr. Mikhail's arguments seem to be that (1) he, as a private individual, can prosecute violations of § 242, *see* Resp. to Kahn & Fellheimer ¶ 14(c) (Docket No. 27) ("And because crimes are involved, Plaintiff is bringing his Complaint before a Federal Judge . . . ."); (2) he can compel Pennsylvania Attorney General Kathleen Kane "to join this case as Involuntary Plaintiff," Resp. to Kahn Fellheimer ¶¶ 14(d), 35-41; and (3) there is a civil cause of action under § 242, *see* Compl. ¶ 220-21, 240-41 (contending that "Defendants are liable to Plaintiff for their violations of" § 242 and thus that he is entitled "to an award of punitive damages"). Although Mr. Mikhail's desire to charge the Defendants criminally is understandable on some intuitive plane, for the reasons explained below, none of these contentions has any merit, and to the extent that Counts I and II purport to assert claims under 18 U.S.C. § 242, they are dismissed with prejudice.

First: In federal court, at least, a private individual cannot prosecute a criminal action; not only do federal criminal laws provide no basis for such prosecution, but under Article III of the Federal Constitution, federal courts lack jurisdiction over such suits. As the Supreme Court has explained, "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution. . . . *a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another*." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (emphasis added) (citations omitted).[24] Lower federal

---

[24] *See also, e.g., Diamond v. Charles*, 476 U.S. 54, 64-65 (1986) ("Diamond could not compel the State to enforce [a criminal law] against appellees because 'a private citizen lacks a

courts, including the Third Circuit Court of Appeals, have consistently enforced this rule by

dismissing private attempts to prosecute. *See, e.g.*, *Johnson v. U.S. DOJ*, --- F. App'x ---, ---, No.

13-2447, 2013 WL 6068089, at *1 (3d Cir. Nov. 19, 2013) (per curiam) ("Nor could Johnson

bring a private criminal complaint against the judges or prosecutors, as 'a private citizen lacks a

judicially cognizable interest in the prosecution . . . of another .'" (ellipsis in original) (quoting

*Linda R.S.*, 410 U.S. at 619)).[25] For the very same reason, a private individual cannot sue—at

least in federal court[26]—to compel the state or federal government to investigate or prosecute an

alleged crime. *See, e.g.*, *Williams ex rel. Faison v. U.S. Penitentiary Lewisburg*, 377 F. App'x

255, 256 (3d Cir. 2010) (per curiam) ("Because Williams requested only criminal prosecution of

those allegedly responsible for her brother's death, her claims are not cognizable."); *see also,*

*e.g.*, *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive

---

judicially cognizable interest in the prosecution or nonprosecution of another.'" (quoting *Linda R.S.*, 410 U.S. at 619)); *Heckler v. Chaney*, 470 U.S. 821, 847 (1985) (Marshall, J., concurring in the judgment) ("Criminal prosecutorial decisions vindicate only intangible interests, common to society as a whole, in the enforcement of the criminal law. The conduct at issue has already occurred; all that remains is society's general interest in assuring that the guilty are punished." (citing *Linda R.S.*, 410 U.S. at 619)); *Gill v. Texas*, 153 F. App'x 261, 262-63 (5th Cir. 2005).

[25] *See also, e.g.*, *Brown v. Calabro*, 512 F. App'x 137, 139 (3d Cir. 2013) (per curiam); *Kent v. Vickers*, 481 F. App'x 709, 711 (3d Cir. 2012) (per curiam) ("The District Court properly dismissed any criminal claims that Kent attempted to bring, as a private person does not have a 'judicially cognizable interest in the prosecution . . . of another.'" (quoting *Linda R.S.*, 410 U.S. at 619)); *Kent v. Ed Carber Inc.*, 467 F. App'x 112, 113 (3d Cir. 2012); *Aruanno v. Fishman*, 443 F. App'x 679, 680-81 (3d Cir. 2011) (per curiam); *cf., e.g.*, *Sanders v. Downs*, 420 F. App'x 175, 180 (3d Cir. 2011) (per curiam) ("As to Sanders' claim against the Pennsylvania State Police and the Bradford County police officers, the District Court correctly reasoned that there is no constitutional right to the investigation or prosecution of another.").

[26] The courts of the Commonwealth of Pennsylvania are subject to different requirements. Pennsylvania has a procedure by which a plaintiff can submit a criminal complaint to a Commonwealth attorney for approval or disapproval, subject to limited and deferential review by the competent court of common pleas. *See* Pa. R. Crim. P. 506. *See generally In re Hickson*, 821 A.2d 1238 (Pa. 2003). Nonetheless, for the reasons explained below, Mr. Mikhail could not properly ask the Commonwealth of Pennsylvania to approve a charge under 18 U.S.C. § 242, because the Commonwealth has no authority to prosecute federal crimes.

authority and absolute discretion to decide whether to prosecute a case."). "Our entire criminal justice system is premised on the notion that a criminal prosecution pits the government against the governed, not one private citizen against another." *Robertson v. U.S. ex rel. Watson*, 560 U.S. 272, 278 (2010) (Roberts, CJ., dissenting from the dismissal of certiorari as improvidently granted).

None of this discussion of what the law is today means that Mr. Mikhail's desire to prosecute the Defendants criminally is beyond comprehension. As this Court has observed, "Prosecution by public officials was not always the norm. 'Under the ancient English system, criminal prosecutions were instituted at the suit of private prosecutors, to which the King lent his name in the interest of good peace and good order of society.'" *U.S. ex rel. Nagy v. Patton*, No. 11-mc-0267, 2012 WL 1858983, at *2 n.3 (E.D. Pa. May 22, 2012) (quoting *Hale v. Henkel*, 201 U.S. 43, 59 (1906)). Indeed, private criminal prosecutions once characterized the common law.[27] In colonial America, as "[i]n England, victims prosecuted their own crimes *pro se*, without lawyers and at their own expense," and "American prosecutions remained private well into the nineteenth century."[28] "In colonial Pennsylvania," for instance, "crimes were viewed as an

---

[27] In fact, the indictment (and hence the beginning of the more intimate involvement of the Crown) was not truly born until King Henry II's Assize at Clarendon in 1166, and many years passed before the Crown instigated process resembling public criminal prosecutions in anything near the number of private "appeals of felony," or, in essence, private criminal prosecutions. *See generally* 1 Frederick Pollock & Frederic William Maitland, *The History of English Law Before the Time of Edward I*, at 161-62 (Liberty Fund 2010) (2d ed. 1898); 2 *id.* at 672 ("[A] form of criminal procedure which had the future before it, that, namely, which is initiated by a presentment or indictment. . . may have been occasionally used in England before the year 1166 when Henry II. issued his Assize of Clarendon. . . [but it was] machinery that Henry II. set in motion . . . ."); Theodore F.T. Plucknett, *A Concise History of the Common Law* bk. 2, pt. 2, ch. 1, at 424-41 (Liberty Fund 2010) (5th ed. 1956); John H. Langbein et al., *History of the Common Law* ch. 4, pt. 1 (2009).

[28] Stephanos Bibas, *The Machinery of Criminal Justice* 3-4 (2012); *see also Rehberg v. Paulk*, 132 S. Ct. 1497, 1503 (2012) ("When § 1983's predecessor was enacted in 1871, it was common for criminal cases to be prosecuted by private parties." (citing *Stewart v. Sonneborn*, 98

offense against the individual victim, and private prosecutions were the most common mode by which the criminal justice system functioned." *In re Hickson*, 821 A.2d 1238, 1244 (Pa. 2003) (citation, internal quotation marks, and alteration omitted).

But private prosecutions receded as "the prosecutorial function was increasingly assumed by public officials." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1504 (2012). It had always been the case that, in prosecuting criminal cases, private parties, "seeking to vindicate" what was viewed as not only a private, but "a public wrong," "necessarily acted (and now act) on behalf of the sovereign" such that, though they "could initiate criminal prosecutions, . . . the Crown— entrusted with the constitutional responsibility for law enforcement—could enter a *nolle prosequi* to halt the prosecution." *Robertson*, 560 U.S. at 278-80 (Roberts, CJ., dissenting from the dismissal of certiorari as improvidently granted) (citing cases). And today, "[a]lthough the unfettered right of private prosecution is still recognized in some jurisdictions, the majority [of states] have either prohibited the practice altogether or limited the private prosecutor to acting under the control of the public prosecutor." *Sedore v. Epstein*, 56 A.D.3d 60, 64 (N.Y. App. Div. 2008) (citations omitted). And, according to at least four Justices of the Supreme Court, "Crimes and offenses against the laws of any State can only be defined, prosecuted and pardoned by the sovereign authority of that State." *Robertson*, 560 U.S. at 276 (Roberts, CJ., joined by Scalia, Kennedy & Sotomayor, JJ., dissenting from the dismissal of certiorari as improvidently granted) (alteration removed) (quoting *Huntington v. Attrill*, 146 U.S. 657, 669 (1892)).

As a result of that evolution, it is today beyond all reasonable doubt that "[t]he prosecution of violations of federal criminal law in federal court is a function of the federal

---

U.S. 187, 198 (1879) (Bradley, J., dissenting) ("[E]very man in the community, if he has probable cause for prosecuting another, has a perfect right, by law, to institute such prosecution, subject only, in the case of private prosecutions, to the penalty of paying the costs if he fails in his suit.")).

government, not private parties," *Nagy*, 2012 WL 1858983, at *2, and federal courts lack the

power to direct the filing of criminal charges, *e.g.*, *Powell v. Katzenbach*, 359 F.2d 234, 234-35

(D.C. Cir. 1965) (per curiam); *Peek v. Mitchell*, 419 F.2d 575, 577-78 (6th Cir. 1970). Thus,

even if in some limited instances *Pennsylvania* continues to recognize "a citizen's right to pursue

his victimizer in criminal courts via a private criminal complaint," *In re Hickson*, 821 A.2d at

1238, Pennsylvania's practice does not control in federal court. Here in federal court, quite

simply, "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions

that generally rest in the prosecutor's discretion," *United States v. Batchelder*, 442 U.S. 114, 124

(1979), and even when individuals are wronged in a manner cognizable under criminal law, they

"do not have a constitutional right to the prosecution of alleged criminals," *Capogrosso v.*

*Supreme Court of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009) (per curiam).[29]

---

[29] Whether or not the doctrine is sufficiently historically rooted, victims simply do not have standing to bring private prosecutions in federal court, despite such compelling arguments as those, for instance, by Justice Stevens, who once argued that "[h]istory supports the proposition that punishment or deterrence can redress an injury" because "[i]n past centuries in England, in the American Colonies, and in the United States, private persons regularly prosecuted criminal cases," and "[t]he interest in punishing the defendant and deterring violations of law by the defendant and others was sufficient to support the 'standing' of the private prosecutor even if the only remedy was the sentencing of the defendant to jail or to the gallows." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 127-28 (1998) (Stevens, J., concurring in the judgment) (footnotes omitted). One might also wonder how it is that a private citizen can establish Article III standing as a *qui tam* relator, *see Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771-78 (2000), if a private individual cannot establish standing as a victim of crime.

But these questions are foreclosed by the Supreme Court's established interpretations. Whether, "[g]iven this history," as Justice Stevens alone contends, "the Framers of Article III surely would have considered such proceedings to be 'Cases' that would 'redress' an injury even though the party bringing suit did not receive any monetary compensation," *Steel Co.*, 523 U.S. at 128 (Stevens, J., concurring in the judgment), the Supreme Court today does not see violations of criminal statutes as ordinarily sufficient to confer standing on private litigants; nor, apart from the problem of standing, does the Congress normally permit anyone other than the Attorney General and his agents from litigating on behalf of the United States, as discussed herein. A private party's lack of standing to initiate a criminal prosecution is, again, the rule of *Linda R.S. v. Richard D.*, 410 U.S. at 619. *See also supra* note 24 and accompanying text. (In truth, *Linda*

Second, a principle related to and consistent with the first, that individuals do not have a justiciable interest in prosecutions, is that federal prosecutions are "brought in the name of the United States as sovereign" and that the *federal* "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *Nixon*, 418 U.S. at 693-94 (citing U.S. Const. art. II, § 2). Congress has entrusted this exclusive and plenary power, in turn, specifically to the United States Attorney General, and private individuals, save for criminal defendants raising constitutional objections, are without power to question its exercise. *See, e.g.*, *Powell*, 359 F.2d at 234-35 (citing cases).[30] In fact, because of the so-called "Take Care" command of

---

*R.S.* and the Court's other standing cases do not clearly state that a victim's lack of standing is *constitutional* (i.e., imposed by Article III), rather than *prudential*, but their general approach and language strongly suggest that that is the case. *E.g.*, *Diamond v. Charles*, 476 U.S. 54, 64-65 (1986) ("The conflict between state officials empowered to enforce a law and private parties subject to prosecution under that law is a classic 'case' or 'controversy' *within the meaning of Art. III*. . . . The conflict presented by Diamond is different. Were the Abortion Law to be held constitutional, Diamond could not compel the State to enforce it against appellees because 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.'" (emphasis added) (quoting *Linda R.S.*, 410 U.S. at 619))). Moreover, *even if* Article III permitted private prosecutions, there is no federal statutory basis for a victim to bring such a suit, as discussed above.

[30] *See also* 28 U.S.C. § 516 ("Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."); 28 U.S.C. § 547 (United States Attorneys); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)); *United States v. FCC*, 652 F.2d 72, 87 & n.74 (D.C. Cir. 1980); *Newman v. United States*, 382 F.2d 479, 480 & n.4 (D.C. Cir. 1967); *Smith v. Krieger*, 389 F. App'x 789, 798-99 (10th Cir. 2010) ("Congress has by statute conferred the power to prosecute crimes in the name of the United States on the United States Attorney General and his delegates. The long-standing view of the Supreme Court is that such power is exclusive." (citation omitted)); *Saro v. Brown*, 11 F. App'x. 387, 388 (6th Cir. 2001); *Peek*, 419 F.2d at 577-78; *Smith v. United States*, 375 F.2d 243, 246-47 (5th Cir. 1967); *Keenan v. McGrath*, 328 F.2d 610, 611 (1st Cir. 1964) (per curiam) ("[W]e are unaware of any authority for permitting a private individual to initiate a criminal prosecution in his own name in a United States District Court . . . .").

Article II of the Constitution,[31] federal crimes arguably may only be prosecuted in federal court, and by the President's delegates. *See, e.g.*, *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 756 (5th Cir. 2001) ("The prosecution of criminal cases has historically lain close to the core of the Article II executive function."); *cf., e.g.*, *Morrison v. Olson*, 487 U.S. 654, 693-94 (1988) (separation of powers grounds). In any case, Congress has for many years prescribed as much. *See* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."); *see, e.g.*, *Tennessee v. Davis*, 100 U.S. 257, 262 (1880) ("But there can be no criminal prosecution initiated in any State court for that which is merely an offence against the general government."); *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 28 (1820) ("As to crimes and offences against the United States, the law of Congress had vested the cognizance of them exclusively in the federal Courts.").[32] Together, these principles of exclusive federal prosecution by the federal executive branch in federal court "preclude complaints by private citizens," *United States ex rel. Savage v. Arnold*, 403 F. Supp. 172, 174 (E.D. Pa. 1975), as well as criminal complaints on federal charges

---

[31] U.S. Const. art. II, § 3, cl. 4 ("[The President] shall take Care that the Laws be faithfully executed . . . .").

[32] Justice Washington's opinion for the Court continues,

> The State Courts, therefore, could exercise no jurisdiction whatever over such offences, unless where, in particular cases, other laws of the United States had otherwise provided; and wherever such provision was made, the claim of exclusive jurisdiction to the particular cases was withdrawn by the United States, and the concurrent jurisdiction of the State Courts was *eo instanti* restored, not by way of grant from the national government, but by the removal of a disability before imposed upon the State tribunals.

*Houston*, 18 U.S. (5 Wheat) at 28; *see also id.* at 35 (Johnson, J., concurring in the judgment) ("[C]rimes against a government are only cognizable in its own Courts, or in those which derive their right of holding jurisdiction from the offended government."); *id.* at 69 (Story, J., concurring in the judgment) ("In a government formed like ours, where there is a division of sovereignty, and, of course, where there is a danger of collision from the near approach of powers to a conflict with each other, it would seem a peculiarly safe and salutary rule, that each government should be left to enforce its own penal laws in its own tribunals.").

by states. Thus, Mr. Mikhail cannot, nor could the Commonwealth of Pennsylvania (should it have desired to intervene on his behalf) prosecute the Defendants under 18 U.S.C. § 242.[33]

Third, and finally, Mr. Mikhail also cannot bring a *civil* claim under 18 U.S.C. § 242 because § 242 creates no private right of action and none can be implied. *Carpenter v. Ashby*, 351 F. App'x 684, 688 (3d Cir. 2009) (per curiam) ("[W]e agree with the District Court's dismissal of the 18 U.S.C. § 241 and § 242 claims. Neither statute creates a civil cause of action." (citing *United States v. City of Philadelphia*, 644 F.2d 187, 199 (3d Cir. 1980)); *Colon-Montanez v. Pa. Healthcare Serv. Staffs*, 530 F. App'x 115, 118 (3d Cir. 2013) (per curiam) ("[T]hese criminal statutes provide no private right of action . . . ."); *McCauley v. Computer Aid Inc.*, 447 F. Supp. 2d 469, 477 (E.D. Pa. 2006) ("It is well-settled that these criminal statutes cannot be the bases for remedy in a civil suit."), *aff'd*, 242 F. App'x 810 (3d Cir. 2007). No sister circuit has reached a contrary conclusion.[34] In other words, § 242 is purely a criminal statute—

---

[33] There is yet a further bar that would arise were Mr. Mikhail to attempt to join the Commonwealth of Pennsylvania (by and through Attorney General Kane) as an "involuntary plaintiff" in this matter in order to pursue *any* action, whether criminal or civil: Eleventh Amendment sovereign immunity. *See, e.g.*, *Thomas v. FAG Bearings Corp.*, 50 F.3d 502, 505-06 (8th Cir. 1995) ("[T]he Eleventh Amendment bars involuntary joinder of [the State]. Involuntary joinder will compel [the State] to act by forcing it to prosecute [the Defendant] at a time and place dictated by the federal courts. This disrespect for state autonomy in decision-making is precisely what the Eleventh Amendment was intended to avoid." (footnote omitted)); *see also, e.g.*, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("The very object and purpose of the 11th Amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." (quoting *In re Ayers*, 123 U.S. 443, 505 (1887))); *cf. Commonwealth v. Pittman*, 528 A.2d 138, 143 (Pa. 1987) ("Courts do not and have never acted as prosecutors in the Anglo American tradition of law. A fortiori, courts do not exercise prosecutorial discretion; rather, that is for the exclusive judgment of prosecutors themselves. Indeed, there is no mechanism in the law of this Commonwealth for a court to exercise the prosecutorial function.").

[34] *See, e.g.*, *Pope v. Thornburgh*, 978 F.2d 744 (D.C. Cir. 1992) (per curiam) (table opinion); *Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir. 1989) (per curiam); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994); *Hanna v. Home Ins. Co.*, 281 F.2d 298, 303 (5th Cir. 1960); *Ali v. Shabazz*, 8 F.3d 22 (5th Cir. 1993) (per curiam) (table opinion); *Owens v. Johnson*, 191 F.3d 452 (6th Cir. 1999) (table opinion); *Nasserizafar v. Ind. Dep't of Transp.*, ---

not even the United States, the only entity with the authority to prosecute violations of § 242, can bring a civil action under it. *See United States v. City of Philadelphia*, 644 F.2d at 199.

*   *   *

As there is no meritorious argument under any theory that would give Mr. Mikhail the authority to bring suit, criminal or civil, under 18 U.S.C. § 242, his claims in Counts I and II brought pursuant to § 242 must be dismissed with prejudice.

### C.    Section 1983's Statute of Limitations

Mr. Mikhail's § 1983 claims against Dr. Lustig, Judges Arthur Tilson, Emanuel Bertin, and Rhonda Lee Daniele, and the Superior Court Judges, Judges Mary Jane Bowes, Christine L. Donohue, and Judith Ference Olson, must be dismissed because the statute of limitations applicable to those claims has run its course.[35] *See, e.g.*, *Hunterson v. Disabato*, 244 F. App'x 455, 457-58 (3d Cir. 2007) (per curiam) ("[A] complaint can be dismissed for failure to state a claim if the allegations show that relief is barred under the relevant statute of limitations.").

Dr. Lustig was appointed "to perform a custody evaluation" in December 2009. Compl. ¶ 17. Mr. Mikhail alleges that Dr. Lustig "got corrupted and bribed by [Ms. Kahn]," Compl. at 11, and that, in exchange for $12,500 paid as a bribe—so interpreted, it seems, because in comparison Mr. Mikhail paid Dr. Lustig only $6500—Dr. Lustig conspired with Ms. Kahn to

---

F. App'x ---, ---, No. 13-1827, 2013 WL 5421674, at *1 (7th Cir. Sept. 30, 2013); *United States v. Wadena*, 152 F.3d 831, 846 (8th Cir. 1998) (addressing 18 U.S.C. § 241, but following *Cok*, 876 F.2d at 2, and citing language regarding both §§ 241 and 242); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (per curiam); *Houck v. Gurich*, 515 F. App'x 724 (10th Cir. 2013) (per curiam).

[35] All of these Defendants raise several other defenses each, but because the statute of limitations entirely covers their alleged misconduct under § 1983, the claims against them will be dismissed with prejudice. The judges are also covered by other defenses discussed below.

51

incriminate Mr. Mikhail, Compl. at 10. Mr. Mikhail also alleges that he discovered Dr. Lustig's conspiracy with Ms. Kahn from the file that Judge Carluccio ordered released, and that he thus "filed a Petition for Contempt on January 7, 2011 showing that the PFA was secured through Fraud upon the Court." However, Dr. Lustig departs the saga in December 2010, when "Judge Carluccio entered an order . . . that Dr. Lustig shall release his file and records and cease and desist from treating Child." Compl. ¶ 30.

Mr. Mikhail's allegations against Judges Tilson and Bertin are scanty and all relate to occurrences in December 2009 or early 2010. *See* Compl. ¶¶ 9, 16, 47. Those against Judge Daniele extend no later than early 2010. *See* Compl. ¶¶ 17–19, 22. As is evident from the relevant Pennsylvania Superior Court docket, of which this Court takes judicial notice, the Superior Court Judges, whom Mr. Mikhail charges solely with violating his rights by erroneously deciding his appeal, *see* Compl. ¶¶ 29, 73–82, rendered their opinion in December 2010 and remitted the case in February 2011.[36]

---

[36] The Court takes judicial notice of the state court docket, No. 1218 EDA 2010 (Pa. Super. Sept. 10, 2013). *See* Fed. R. Civ. P. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). As the Third Circuit Court of Appeals has stated,

> To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.

> Specifically, on a motion to dismiss, we may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (citations omitted); *see also, e.g.*, *Brown v. Bd. of Educ.*, 344 U.S. 1, 3 (1952) (per curiam) ("This Court takes judicial notice of a fourth case, which is pending in the United States Court of Appeals for the District of Columbia Circuit, Bolling et al. v. Sharpe et al., No. 11,018 on that court's docket."); *Berkowitz v. Phila. Chewing Gum Corp.*, 303 F.2d 585, 587 (3d Cir. 1962) ("We may take and we do take judicial notice of the fact, however, that the petition of Kinch's parents in the Orphans' Court of Delaware County, Pennsylvania (798-1960), entitled 'Re Estate of Wilson Kinch, a Minor', is a petition for the appointment of a guardian ad litem . . . .");

Whatever the merits of Mr. Mikhail's § 1983 claims against Dr. Lustig and these particular Judges, and whatever their relevance to Mr. Mikhail's state law causes of action, the statute of limitations for these § 1983 claims is two years, given that federal courts apply the state statute of limitations for personal injury claims, and Pennsylvania's limitations periods for such claims runs two years. *Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998). No misconduct is alleged on part of Dr. Lustig or the Judges after December 2010, Mr. Mikhail claims to have discovered Dr. Lustig's alleged misconduct no later than January 2011, and the Superior Court remitted the case in February 2011. Mr. Mikhail filed these claims on September 3, 2013, well beyond the two-year anniversary dates of the supposed wrongful acts or discovery of such acts. Therefore, he is out of time and the statute of limitations bars his § 1983 claims against Dr. Lustig and Judges Tilson, Bertin, Daniele, Bowes, Donohue, and Olson. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) ("While the language of Fed. R. Civ. P. 8(c) indicates that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss, an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading.").

Similarly, any allegations of conspiracy between Dr. Lustig, Ms. Phillips, and Ms. Kahn, for purposes of § 1983 and state action (discussed *infra*), must be discounted because they do not involve any of the other Defendants and are otherwise barred by § 1983's statute of limitations.

---

*Pennsylvania v. Brown*, 373 F.2d 771, 778 (3d Cir. 1967) ("[A] federal court may take judicial notice of matters of record in state courts within its jurisdiction. . . ." (citing *Berkowitz*, 303 F.2d at 587); *United States v. Remoi*, 404 F.3d 789, 793 n.1 (3d Cir. 2005) (per curiam); *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 164 & n.15 (3d Cir. 2004); *United States v. Isaac*, 134 F.3d 199, 206 (3d Cir. 1998).

**D.      State Action: Claims Against the Private Defendants Under 42 U.S.C. § 1983 (Counts I & II)**

Mr. Mikhail's § 1983 claims against several of the Defendants—which are not barred by *Rooker–Feldman* because they are not for harms resulting from state court judgments, or by *Younger*, because it does not bar claims for monetary damages—must nonetheless be dismissed for lack of state action. The ostensibly private parties are Jolie Kahn, Esquire (the child's mother, Mr. Mikhail's soon-to-be-ex-wife, and his opponent in the state court proceedings), Alan Fellheimer, Esquire (Ms. Kahn's attorney), and Dorothy Phillips, Esquire (Ms. Kahn's former attorney, and now deceased).[37] For the reasons discussed below, the § 1983 claims (and therefore the remainder of the federal claims) against them must be dismissed.

A plaintiff must prove two distinct elements to prevail on a § 1983 claim. He must not only "allege the violation of a right secured by the Constitution and laws of the United States," but he must also "show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). This second, "under color of state law" requirement is identical, for present (and for most practical) purposes to the Fourteenth Amendment's state action requirement. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (citing *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 928-32 (1982); *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009); *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169-70 & n.1 (3d Cir. 2004) (Alito, J.). That the two requirements are equivalent, of course, is readily apparent when the conduct in question is

---

[37] The private parties may also include Preston Findlay, Esquire (who, as Counsel for the Missing Children Division of the National Center for Missing and Exploited Children, submitted a four-page affidavit in one of the state court proceedings), and Sheila Dugan and Chip Minto, employees of Kids First, the visitation supervision service the state court ordered Mr. Mikhail to use. The Court need not and will not decide, however, whether these individuals are state actors, because Mr. Mikhail has failed to state a claim against any of them. *See infra* Section III.E. If these parties are private actors, however, then the analysis in this Section applies to them.

alleged to violate the Federal Constitution, because violation of the Constitution, unless by the

federal government or in exceedingly narrow circumstances not relevant here,[38] can only occur

by action "fairly attributable to the State"—"[a]s a matter of substantive constitutional law the

state-action requirement reflects judicial recognition of the fact that most rights secured by the

Constitution are protected only against infringement by governments." *Lugar*, 457 U.S. at 936-

37 (citation and internal quotation marks omitted); *cf., e.g.*, *Martinez v. Colon*, 54 F.3d 980, 986

(1st Cir. 1995) ("To be sure, violence is attributable to state action if the perpetrator is acting

under color of state law, but that is a virtual tautology." (citations omitted)).[39] Section 1983 thus

protects against constitutional violations by the State, but "not against wrongs done by

individuals," *Price*, 383 U.S. at 799. Only where the State is responsible for the specific conduct

causing the alleged harm does § 1983 apply. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141-

42 (3d Cir. 1995); *see Kach*, 589 F.3d at 646 ("[A] plaintiff seeking to hold an individual liable

under § 1983 must establish that she was deprived of a federal constitutional or statutory right by

a state actor.").

 Thus, "[t]he ultimate issue in determining whether a person is subject to suit under

§ 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the

---

[38] The two ways that private actors can violate the Constitution (i.e., without acting, for those purposes, as state or federal actors), are by enslaving another in violation of the Thirteenth Amendment and illegally transporting alcohol into a state in violation of its laws. *See* U.S. Const. amend. XIII, § 1 ("Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."); *id.* amend. XXI, § 2 ("The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.").

[39] The Fourteenth Amendment provides, in pertinent part: "No *State* shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall *any State* deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1 (emphasis added).

55

alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker*, 457 U.S. at 838 (quoting *Lugar*, 457 U.S. at 937).

> The "fair attribution" question, in turn, has two components.
>
> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible. . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Without a limit such as this, private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them.

*Lugar*, 457 U.S. at 937. These two questions may "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* For this reason, the judges Mr. Mikhail has sued are clearly state actors.

But "[t]he two principles diverge when the constitutional claim is directed against a party without such apparent authority, *i.e.*, against a private party." *Id.* Because Ms. Kahn and her attorneys are not state officials like the defendant judges, they are not clearly state actors, and closer analysis of each of the two "fair attribution" steps is required.

For a private party to be characterized as a "state actor," the Supreme Court has explained, it is not enough that he acted "pursuant to [a] statute, without something more." *Id.* at 939.

> [T]hat "something more" which would convert the private party into a state actor might vary with the circumstances of the case. . . . [T]he [Supreme] Court has articulated a number of different factors or tests in different contexts: *e.g.*, the "public function" test; the "state compulsion" test; the "nexus" test; and in the case of prejudgment attachments, a "joint action test."

*Id.* (citation and footnote omitted). Because the inquiry is "necessarily fact-bound," *id.*, the Third Circuit Court of Appeals has recategorized the inquiries, but regardless of the label they are

given, only one inquiry is relevant, given Mr. Mikhail's allegations: "'whether the private party has acted with the help of or in concert with state officials,' a test also known as the 'joint action test.'" *Romich v. Sears Holding Corp.*, No. 12-5383, 2013 WL 5925082, at *12 (E.D. Pa. Nov. 5, 2013) (quoting *Kach*, 589 F.3d at 646, and citing *Cahill ex rel. L.C. v. Live Nation*, 512 F. App'x 227, 230 (3d Cir. 2013)). Under this "joint action" test, "a private party will be deemed a state actor if it is a 'willful participant in joint action with the State or its agents.'" *Cahill*, 512 F. App'x at 230 (quoting *Lugar*, 547 U.S. at 941).[40]

*   *   *

Mr. Mikhail raises two arguments regarding why several of those Defendants who are ostensibly private parties are in fact state actors. First, he contends, the attorneys he has named as Defendants are state actors simply because they are attorneys and, therefore, are "officers of the judiciary," who, "clothed with the authority of State Law" by their licenses to practice law, are thereby state actors for purposes of 42 U.S.C. § 1983. Resp. to Kahn & Fellheimer ¶ 15. Second, he pursues a conspiracy-based joint action theory. *See, e.g.*, Resp. to Kahn & Fellheimer ¶ 16.

Under no configuration of the joint action theory—those Mr. Mikhail enlists and a third he has not—can Mr. Mikhail sue the defendant attorneys, or any of the other private party Defendants, under § 1983.

### 1.  Attorneys Are Not State Actors Solely Because They Are Attorneys

First, Mr. Mikhail argues, "[w]e all should agree that attorneys in private practice are *not* state employees but are clothed with the authority of state law." Resp. to Kahn & Fellheimer

---

[40] The other two inquiries are: "whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state" and "whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity ." *Kach*, 589 F.3d at 646 (internal quotation marks and alteration omitted). Neither is applicable here.

57

¶ 15(d). Thus, he argues that the defendant attorneys, simply because they are attorneys, are also, therefore, state actors acting under color of law.

This contention, tried before, has been squarely rejected by the Supreme Court. "It is often said that lawyers are 'officers of the court.' But the Courts of Appeals are agreed that a lawyer representing a client is not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983." *Polk County v. Dodson*, 454 U.S. 312, 318-19 (1981). Further, the Third Circuit Court of Appeals has long espoused that

> [a]lthough states license lawyers to practice, and although lawyers are deemed "officers of the court," this is an insufficient basis for concluding that lawyers act under color of state law for the purposes of 42 U.S.C. § 1983. Liability under 42 U.S.C. § 1983 cannot be predicated solely on the state's licensing of attorneys. Participation in a highly regulated profession does not convert a lawyer's every action into an act of the State or an act under color of state law.

*Henderson v. Fisher*, 631 F.2d 1115, 1119 (3d Cir. 1980) (per curiam) (citing *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 355 (1974)); *see also, e.g.*, *Jackson*, 419 U.S. at 354 ("Doctors, optometrists, lawyers, Metropolitan, and Nebbia's upstate New York grocery selling a quart of milk are all in regulated businesses, providing arguably essential goods and services, 'affected with a public interest.' We do not believe that such a status converts their every action, absent more, into that of the State."). "Attorneys performing their traditional functions will not be considered state actors solely on the basis of their position as officers of the court." *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 277-78 (3d Cir. 1999).[41] Mr. Mikhail cannot, therefore,

---

[41] *See also, e.g.*, *Brown v. Terrell*, 322 F. App'x 93, 94 (3d Cir. 2009) (per curiam); *Perez v. Griffin*, 304 F. App'x 72, 75 (3d Cir. 2008) (per curiam) ("Private attorneys performing their traditional functions are not considered to act under color of state law for purposes of § 1983."); *Steward v. Meeker*, 459 F.2d 669, 670 (3d Cir. 1972) (per curiam); *Hoai v. Vo*, 935 F.2d 308, 313 & n.5 (D.C. Cir. 1991); *Bilal v. Kaplan*, 904 F.2d 14, 15 (8th Cir. 1990) (per curiam); *Mills v. Criminal Dist. Court No. 3*, 837 F.2d 677, 679 (5th Cir. 1988); *Barnard v. Young*, 720 F.2d 1188, 1189 (10th Cir. 1983).

satisfy the state action requirement necessary to bring his § 1983 claims against the defendant attorneys solely because they are attorneys.

### 2. Mr. Mikhail's Allegations of Conspiracy Are Insufficient to Establish Joint Action

Because the defendant attorneys are not treated as state actors for purposes of the Constitution or § 1983 solely because they are attorneys, they "may be held liable under section 1983 only if they have engaged in 'joint activity' with" those Defendants who in fact *are* state actors. *Hoai v. Vo*, 935 F.2d 308, 313 n.5 (D.C. Cir. 1991). Mr. Mikhail attempts to pursue such a claim by arguing, additionally, that all the otherwise ostensibly private party Defendants conspired with state officials—namely, the defendant judges, but also, perhaps, with the court-appointed professionals.

"[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral Co.*, 615 F.3d 159, 178. A conspiracy is not parallel conduct by different parties; it must embody, at its heart, "an agreement between the defendants and state officials—a 'meeting of the minds'—to violate the plaintiff's rights." *Chambers v. Phila. Media Network*, No. 11-6589, 2013 WL 4857995, at *3 (E.D. Pa. Sept. 12, 2013) (quoting *Zenquis v. City of Philadelphia*, 861 F. Supp. 2d 522, 528-29 (E.D. Pa. 2012) (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008))). And the law is clear that the plaintiff must plead more than legal conclusions of a conspiracy or agreement. Rather, for his complaint to survive a motion to dismiss, he must plead "'enough factual matter (taken as true) to suggest that an agreement was made," in other words, "plausible grounds to infer an agreement.'" *Great W. Mining & Mineral Co.*, 615 F.3d at 178 (quoting *Twombly*, 550 U.S. at 556). Thus, the Court separates the wheat of factual allegations from the

chaff of conclusory allegations that there was a corrupt conspiracy, and considers only the former to determine whether the inference of conspiracy is plausible. *See id.*

Both the Supreme Court and the Third Circuit Court of Appeals have written further on the requirements for cases in which a plaintiff alleges conspiracy with a judge. As the Supreme Court has observed, "[M]erely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator or a joint actor with the judge." *Dennis*, 449 U.S. at 28. Such a rule would allow almost any aggrieved party to relitigate its claims under the guise of § 1983; thus, the Supreme Court has been careful to note, for instance, that "we do not hold today that 'a private party's mere invocation of state legal procedures constitutes "joint participation" or "conspiracy" with state officials satisfying the § 1983 requirement of action under color of law.'" *Lugar*, 457 U.S. at 939 n.21. Instead, a plaintiff alleging that defendants conspired with judges must "plead an agreement between the state court judges and Defendants to rule in favor of [Defendants]." *Great W. Mining & Mineral Co.*, 615 F.3d at 178 (citing *Dennis*, 449 U.S. at 28). Bare allegations of conspiracy, or the assertion that "Defendants engaged in a concerted action of a kind not likely to occur in the absence of agreement," are insufficient. *Id.* Thus, for example, allegations such as "there was no way that a Philadelphia court [was] ever going to find against [Defendant] given his relationship with the Philadelphia court system," *id.* (citation and internal quotation marks omitted), are inadequate to plead conspiracy, even "when viewed in concert with the decisions rendered by the Pennsylvania state courts," in the absence of "any factual contentions concerning conduct by [the] Defendants." *Id.*

It is important to distinguish here between the potential "appearance of impropriety," as when a judge "approach[es] a party for whom he or she has just ruled to discuss the possibility of working for that party," from a meeting of the minds sufficient to permit a § 1983 claim against

60

that party. *Id.* at 179. Without a specific allegation of an agreement, such an allegation "describe[s] unilateral action on the part of certain judges" but "does not plausibly suggest the existence of a conspiracy between the party and the judge to exchange favorable rulings for future employment." *Id.* By contrast, as the Third Circuit Court of Appeals explained in *Great Western Mining & Mineral Co.*, the claim of "*specific conduct*" "that the private party defendants had bribed the state-court judge to cause him to issue an injunction in their favor" could suffice, as it did in *Dennis*. 615 F.3d at 179 (emphasis added) (discussing *Dennis*, 449 U.S. at 28); *see also Twombly*, 550 U.S. at 556.

The pleading requirements for conspiracy are thus heightened. *See Great W. Mining Co.*, 615 F.3d at 178-79 ("Great Western has failed to allege except in general terms the approximate time when the agreement was made, the specific parties to the agreement (i.e., which judges), the period of the conspiracy, or the object of the conspiracy."); *see also, e.g.*, *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989) ("To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose."), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000); *Albrecht v. Hamilton*, 233 F. App'x 122, 124-25 (3d Cir. 2007) (per curiam) ("Albrecht, however, fails to plead even 'basic facts' in support of his allegation that the prosecutor worked 'in collusion' with the defendants . . .  nor does he allege any facts from which we can infer that the prosecution shared the defendants' motivation to deprive him of his constitutional rights. Rather, the complaint contains only a general averment of conspiracy amounting to nothing more than a conclusion of law."). And "[t]he standard is even stricter" still "where the state officials allegedly involved in the conspiracy are immune from suit, as are the state court judges here." *Sooner Prods. Co. v.*

*McBride*, 708 F.2d 510, 512 (10th Cir. 1983). "A conspiracy cannot be found from allegations of judicial error, ex parte communications (the manner of occurrence and substance of which are not alleged) or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions." *Capogrosso*, 588 F.3d at 185 (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)); *see also, e.g.*, *Crabtree*, 904 F.2d at 1481.

Here, like the pleading in *Great Western Mining & Mineral Co.*, Mr. Mikhail's "complaint contains no similar allegations of specific conduct by the non-judicial actors that caused the judges to enter into an unlawful conspiracy." 615 F.3d at 179. Because allegations against nonjudicial actors, "without a complementary allegation of conduct *by* the non-judicial actor, does not plausibly suggest the existence of a conspiracy between the party and the judge," *id.* at 179 (emphasis added), the Court will examine Mr. Mikhail's allegations against the defendant judges. In summary, Mr. Mikhail asserts that:

- Judges Bertin, Tilson, and Daniele met *ex parte* with Ms. Kahn, entered unconstitutional PFA orders, one of which caused Mr. Mikhail to be evicted from his home, and awarded Ms. Kahn full custody of the child. *See* Compl. ¶¶ 16–19, 47, 56–59.
- Judge Carluccio required Mr. Mikhail's visits with his daughter to be supervised and limited in duration; entered a PFA order contrary to Pennsylvania precedent; wrote an opinion containing false facts; ordered Mr. Mikhail not to take the child out of Pennsylvania; postponed decision on Mr. Mikhail's petition; required Mr. Mikhail to use the Kids First service for supervision despite knowing that it was corrupt; forced Mr. Mikhail to continue to abide by an expired PFA without a hearing or due process; did not award Mr. Mikhail alimony *pendente lite* for over two years; ordered Mr. Mikhail's marital home to be sold; ordered Mr. Mikhail to pay money to Ms. Kahn; and dismissed three of Mr. Mikhail's petitions. *See* Compl. ¶¶ 23–32, 52–53, 60–72.
- Judge Haaz dismissed Mr. Mikhail's petitions without consideration, long after their filing; dismissed Mr. Mikhail's subpoenas attempting to show Ms. Kahn's fraud upon

the court; disregarded evidence and relied on an *ex parte* meeting with a therapist; entered a custody order in favor of Ms. Kahn "only because Judge Haaz is Jewish and he was protecting Ms. Kahn, who is Jewish," Compl. ¶ 88; and disregarded the child's best interests and right to be represented by a child advocate at a hearing, *see* Compl. ¶¶ 33–34, 43–45, 83–90.

- Judge Page harassed, intimidated, and threatened Mr. Mikhail and told him to "shut up" at a hearing and did not schedule a hearing on one of Mr. Mikhail's petitions. *See* Compl. ¶¶ 91–96.

- Judges Bowes, Donohue, and Olson, of the Pennsylvania Superior Court, disregarded evidence and precedents in their decision and opinion, which contained falsehoods. Compl. ¶¶ 29, 73–82.

Accepted as true, the factual content of these allegations may establish the "appearance of impropriety," *Great W. Mining & Mineral Co.*, 615 F.3d at 179, but there is nothing to be found from which the Court can infer a meeting of the minds necessary to render any of the otherwise private parties state actors for purposes of § 1983 or the Constitution. The allegations above merely "describe unilateral action on the part of certain judges," *id.*; there is nothing, such as a specific bribery allegation, that suggests that the defendant judges in the instant case did anything more than, as impartial adjudicators, find Ms. Kahn and her attorneys' view of the relevant law and facts more compelling than Mr. Mikhail's, even if the judges committed legal error (a conclusion that this Court is not reaching). As discussed above, the case law is clear that "[a] conspiracy cannot be found from allegations of judicial error, ex parte communications (the manner of occurrence and substance of which are not alleged) or adverse rulings absent specific facts demonstrating an agreement to commit the alleged improper actions." *Capogrosso*, 588 F.3d at 185 (quoting *Crabtree*, 904 F.2d at 1481). Moreover, inferring a conspiracy from *ex parte* communications is not only *generally* unwarranted, but, in fact, it is especially so where, as here, a relevant statute—Pennsylvania's Protection from Abuse Act—*specifically provides* for *ex*

*parte* communications between a party and the court. *See* 23 Pa. Cons. Stat. Ann. § 6107 ("If a plaintiff petitions for temporary order for protection from abuse and alleges immediate and present danger of abuse to the plaintiff or minor children, the court shall conduct an ex parte proceeding.").

In sum, Mr. Mikhail has failed to plead facts that would suggest to any reasonable person that the defendant judges conspired with any of the private Defendants, and so "[t]here is no cause of action under [§ 1983] in this case where the state did no more than furnish a forum to private parties and had no interest in the outcome." *Shaffer v. Cook*, 634 F.2d 1259, 1260 (10th Cir. 1980) (per curiam). The fact that Mr. Mikhail has repeatedly lost in state court does not mean that the state court judges were or are "out to get him."

Finally, Mr. Mikhail also cannot base his claim that Ms. Kahn and her lawyers are state actors on the suggestion that any of them conspired with the court-appointed Defendants (Drs. Lustig and Pisa and Ms. Sobel). For one, not only are any of Mr. Mikhail's allegations of conspiracy with Dr. Lustig—if they are otherwise sufficient—confined (within the bounds of plausibility) to conspiracy solely with Dr. Lustig (whom the court dismissed from the underlying proceedings), as explained above, *see supra* Section III.C, those claims are also barred by § 1983's statute of limitations, and thus, too, are any § 1983 claims against Ms. Kahn and her attorneys, even if otherwise appropriate. Second, Mr. Mikhail fails to state a § 1983 claim against Dr. Pisa; *a fortiori* he cannot establish that Dr. Pisa conspired with Ms. Kahn and her attorneys to deprive him of his constitutional rights. Mr. Mikhail's conclusory allegations with regard to Dr. Pisa fail to offer any specific factual content from which this Court could infer a conspiracy.[42]

---

[42] *See infra* note 50 and accompanying text. Further, even if Ms. Dugan and Mr. Minto can be considered state actors, Mr. Mikhail's attempt to rely on an alleged conspiracy with either of

Third, Mr. Mikhail's allegations against Ms. Sobel are also inadequate to make out a claim of conspiracy between her and Ms. Kahn and Ms. Kahn's lawyers. Mr. Mikhail avers that Ms. Sobel, "as she is Jewish and feminist, conspired with Ms. Kahn in order to incriminate [him] and to secure for Ms. Kahn the custody of" their child, Compl. at 19, and that Ms. Kahn's former attorney, Ms. Phillips, communicated *ex parte* with Ms. Sobel, Compl. ¶ 127. Mr. Mikhail's additional recitals that Ms. Sobel "insulted [him] in his faith" and "distorted facts and reported false testimonies," Compl. at 19, including by "[s]ubmitting a custody evaluation report containing falsehoods and lies," Compl. ¶ 169 , are not enough to state a claim even against her alone, *see, e.g.*, *Johnson*, 448 F. App'x at 193. In the way of factual content, he offers only threadbare allegations of Ms. Sobel's poor recall, selective summarization, and connotation-twisting. *See* Compl. at 20. These averments offer nothing to suggest a meeting of the minds between or among the alleged co-conspirators. They are inadequate to plead "malicious cooperation with Ms. Kahn's attorney," Compl. ¶ 173, and cannot serve as the basis for a conspiracy charge that would render Ms. Kahn and her attorneys state actors.

For these reasons, Mr. Mikhail's § 1983 claims against Ms. Kahn, Mr. Fellheimer, and the estate of Ms. Phillips must be dismissed. Although amendment of the Complaint likely would be futile, the Court will dismiss these claims without prejudice in the unlikely event that Mr. Mikhail can in fact plead in good faith any specific allegations of conspiracy.

### 3.   There Is No Other Basis for Finding Joint Action

Finally, the Court will *sua sponte* raise and dispose of one further joint action theory in order to clarify why Mr. Mikhail cannot proceed with a § 1983 claim against the private parties he has named. The issue here is whether, in the absence of sufficient allegations to establish a

---

them to establish state action on the part of Ms. Kahn and her attorneys fails for the same reason reliance on Dr. Pisa fails. *See infra* subsection III.E.1.

conspiracy between judges and private litigants and the litigants' attorneys, allegedly wrongful conduct in the filing and prosecution of protection from abuse orders may render litigants state actors under the narrow rules announced in *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991), and *Lugar v. Edmondson Oil. Co.*, 457 U.S. 922. These cases describe two constricted and relatively unique circumstances in which otherwise private parties may be considered state actors through their joint action despite a lack of conspiracy or other meeting of the minds. Although courts have often addressed the application of these holdings with regard to the amount of the State's compulsive power the private party has invoked (or whether it is actual or potential, *see Angelico*, 184 F.3d at 278), in fewer cases, at least in any depth, have courts discussed why orders issued by a judge cannot fall under those rules. For the reasons discussed below, because the entry of a protection from abuse order, even a temporary, emergency order, requires the judge to exercise his discretion, a petitioner seeking such an order cannot be considered a state actor because he petitioned for such an order. Although Mr. Mikhail does not raise this particular argument, efficiency and fairness counsel in favor of addressing it because Mr. Mikahil is a pro se plaintiff, untutored in the law, and, read together, his varied and unstructured arguments that the private parties he has named are state actors might be interpreted to encompass it.

In *Edmondson*, the Supreme Court held that "a private litigant . . . must be deemed a government actor in the use of peremptory challenges." 500 U.S. at 621. The Court conducted the well-established two-step analysis from *Lugar*, discussed above: it "asked first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." *Id.* (citation omitted). The important analysis,

66

for present purposes, "centers around the second part of the *Lugar* test, whether a private litigant

in all fairness must be deemed a government actor in the use of peremptory challenges." *Id.*

Although the Court could identify "certain principles of general application," it noted that this

second part of the *Lugar* test "is often a factbound inquiry." *Id.* The ultimate question is whether

the private parties have made "extensive use of state procedures with 'the overt, significant

assistance of state officials,'" such that those private parties' actions can fairly be attributed to

the State and they can be said to be state actors. *Id.* at 622 (quoting *Tulsa Prof'l Collection

Servs., Inc. v. Pope*, 485 U.S. 478, 486 (1988)).

Although most aspects of the *Edmondson* Court's "principles of general application" are

inapposite or otherwise unhelpful in answering the present question regarding litigants' and

attorneys' filing of protection from abuse petitions, a close reading of *Edmondson* and *Lugar*

reveals that the true essence of the Court's inquiry, and the aspect most informative here, is

whether and when the state automatically throws its weight behind the private litigants, without

exercising any discretion or judgment. The *Edmondson* Court reasoned that "[w]hen a lawyer

exercises a peremptory challenge, the judge advises the juror he or she has been excused." *Id.* at

623-24. The Court further explained:

> [A] private party could not exercise its peremptory challenges absent the overt,
> significant assistance of the court. The government summons jurors, constrains
> their freedom of movement, and subjects them to public scrutiny and
> examination. The party who exercises a challenge invokes the formal authority of
> the court, which must discharge the prospective juror, thus effecting the "final and
> practical denial" of the excluded individual's opportunity to serve on the petit
> jury. *Virginia v. Rives*, 100 U.S. 313, 322 (1880). Without the direct and
> indispensable participation of the judge, who beyond all question is a state actor,
> the peremptory challenge system would serve no purpose. By enforcing a
> discriminatory peremptory challenge, the court "has not only made itself a party
> to the [biased act], but has elected to place its power, property and prestige behind
> the [alleged] discrimination." *Burton v. Wilmington Parking Authority*, 365 U.S.
> [715], at 725 [(1961)]. In so doing, the government has "create[d] the legal
> framework governing the [challenged] conduct," *National Collegiate Athletic*

> *Assn.* [*v. Tarkanian*], 488 U.S. [179], at 192 [(1988)], and in a significant way has
> involved itself with invidious discrimination.

*Edmonson*, 500 U.S. at 624 (second alteration in original). Not only do peremptory challenges

play an important role "in selecting an entity that is a quintessential governmental body, having

no attributes of a private actor," *id.*, "[t]he fact that the government delegates some portion of

this power to private litigants does not change the governmental character of the power

exercised," *id.* at 626. The crucial point here, as evident from the *Edmondson* Court's discussion,

taken as a whole, is that through the device of peremptory challenges, the government *delegates*

its authority, which remains governmental in character because that authority, once the private

party invokes it, *must* be executed by the judge, who, without any question or exercise of

discretion, *automatically* excuses the juror. The effect is automatic such that the private party is

in fact exercising the State's authority simply by invoking it.

This crucial point is also apparent, although in a different context, in *Lugar*. There, the

Supreme Court held that, "[w]hatever may be true in other contexts," private parties became state

actors for purposes of § 1983 "when the State has created a system whereby state officials will

attach property on the *ex parte* application of one party to a private dispute." 457 U.S. at 942.

The *Lugar* Court also explained, however, that "[a]ction by a private party pursuant to [a] statute,

without something more, [is] not sufficient to justify a characterization of that party as a 'state

actor.'" *Id.* at 939. In *Lugar*, the defendant and state officials proceeded under a

> prejudgment attachment procedure [that] required only that [a petitioner] allege,
> in an *ex parte* petition, a belief that [the named respondent] was disposing of or
> might dispose of [the petitioner's] property in order to defeat his creditors. Acting
> upon that petition, *a Clerk of the state court issued a writ of attachment*, which
> was then executed by the County Sheriff. This effectively sequestered [the named
> respondent's] property, although it was left in his possession. Pursuant to the
> statute, a hearing on the propriety of the attachment and levy was later conducted.

*Id.* at 924-25 (emphasis added). Indeed, pursuant to the Virginia statute, a judge was not involved; the petitioner could proceed by automatic operation of law. The relevant Virginia statutory provisions stated that "[u]pon the filing of the petition . . . , the clerk or the justice of the peace before whom the petition is filed *shall issue an attachment in accordance with the prayer of the petition*." Petitioner's Brief on the Merits at 8-9, *Lugar*, 457 U.S. 922 (quoting then–Va. Code. Ann. § 8-526) (emphasis added). Then, the petitioner, automatically successful, in accordance with these provisions, directed the attachment to the sheriff, who then, again, automatically took his orders to "attach the property mentioned and sought to be attached in the petition . . . ." *Id.* at 10 (citing then–Va. Code Ann. § 8-533). What quickly become apparent are some of the rare qualities of the prejudgment attachment context: due process concerns are paramount here, it would seem, precisely because the State, in establishing such prejudgment attachment procedures, has abdicated the discretion involved in the exercise of its authority to private individuals. *See, e.g.*, *Lugar*, 457 U.S. at 934 ("If the creditor-plaintiff violates the debtor-defendant's due process rights by seizing his property in accordance with statutory procedures, there is little or no reason to deny to the latter a cause of action under the federal statute, § 1983, designed to provide judicial redress for just such constitutional violations.").[43]

---

[43] This proposition is yet easier to make out in the cases upon which *Lugar* relies. In *Fuentes v. Shevin*, 407 U.S. 67 (1972), for instance, the Court explained that the challenged

> Florida law automatically relies on the bare assertion of the party seeking the writ that he is entitled to one and allows a court clerk to issue the writ summarily. It requires only that the applicant file a complaint, initiating a court action for repossession and reciting in conclusory fashion that he is 'lawfully entitled to the possession' of the property, and that he file a security bond . . . On the sole basis of the complaint and bond, a writ is issued command(ing) the officer to whom it may be directed to replevy the goods and chattels in possession of defendant . . . Thus, at the same moment that the defendant receives the complaint seeking repossession of property through court action, the property is seized from him. He is provided no prior notice and allowed no opportunity whatever to challenge the issuance of the writ.

*Lugar* also spelled out two other crucial principles. For one, it explicitly disclaimed that

its extension of state action to private actors, such that private actors could be sued under § 1983,

applied beyond the prejudgment attachment context, although it did not give the apparent reason,

gleaned above. *See id.* at 939 n.21 ("[W]e do not hold today that a private party's mere

invocation of state legal procedures constitutes 'joint participation' or 'conspiracy' with state

officials satisfying the § 1983 requirement of action under color of law. The holding today, as the

above analysis makes clear, is limited to the particular context of prejudgment attachment."

(citation and internal quotation marks omitted)). Nonetheless, it is logical that one of the reasons

the Supreme Court limited its holding to prejudgment attachment is that *prejudgment* attachment

occurs *prejudgment*—that is, before a court has exercised or entertained any judgment.

Prejudgment attachment comprises "situations [that] arise only when a private individual acts

jointly with the aid of a state official, *such as a court clerk or a sheriff*," rather than those in

which the judge exercises his independent judgment. *Smith v. Wood*, 649 F. Supp. 901, 905-07

(E.D. Pa. 1986) (Scirica, J.) (emphasis added); *see also, e.g.*, *Read v. Klein*, 1 F. App'x 866, 871-

72 (10th Cir. 2001) ("Although *Lugar* adopts an expansive test for state action, the decision is

carefully limited to prejudgment seizures of property. In other contexts, a private party's 'mere

invocation of state legal procedures' does not constitute joint participation and thus is not state

---

*Id.* at 74-75. From the cases upon which it relied, including those in which a state prejudgment attachment statute was upheld, *see, e.g.*, *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 607 (1974), the *Lugar* Court observed that although "in each [of these prejudgment attachment cases] the federal issue arose in litigation between creditor and debtor in the state courts and no state official was named as a party," the Supreme Court had "entertained and adjudicated the defendant-debtor's claim that the procedure under which the private creditor secured the disputed property violated federal constitutional standards of due process" and necessarily, therefore, held "that private use of the challenged state procedures with the help of state officials constitutes state action for purposes of the Fourteenth Amendment." *Lugar*, 457 U.S. at 933.

action." (citations and internal quotation marks omitted)); *cf., e.g.*, *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1086 (4th Cir. 1979) ("Such application is appropriate only in the narrow context of a state court or quasi-judicial officer providing prejudgment remedies to a creditor that may cause a deprivation of a debtor's property without due process of law." (citations omitted)). Indeed, the Third Circuit Court of Appeals, in its leading prejudgment seizure case, held that "a private individual who enlists the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing acts under color of law and so may be held liable under section 1983 *if his acts cause a state official* to use the state's power of legal compulsion to deprive another of property." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1267 (3d Cir. 1994) (emphasis added). That holding, it is rather clear, depends upon a private individual's *enlistment* of a state's compulsive powers, with no questions asked—i.e., in the absence of any judicial judgment.[44]

Second, the *Lugar* Court pointed out that a plaintiff has no § 1983 cause of action against the private party who, instead of acting pursuant to the delegation of or opportunity to invoke state authority, "misuse[s] or abuse[s] the statute." *Id.* at 942. The Court explained:

---

[44] In that case, the court held that "a judgment creditor who uses Pennsylvania's procedure for executing on a confessed judgment acts under color of law and becomes a state actor under *Lugar*." *Jordan*, 20 F.3d at 1267. The facts should be read carefully:

> When Fox Rothschild confessed judgment against Jordan Mitchell, Inc., they took action that caused the Sheriff of Philadelphia to execute on the judgment by garnishing Jordan Mitchell, Inc.'s bank account. The sheriff, following routine Pennsylvania practice, acted without prior notice or hearing for Jordan Mitchell, Inc. or any of its agents, employees or stockholders.

*Id.* at 1255. Further, the opinion of the district court below states that upon Fox Rothschild's mere filing of a praecipe, the Prothonotary of the Court of Common Pleas of Philadelphia issued a writ of execution to the Sheriff, who then, by serving it, attached Jordan's checking account. *See* 787 F. Supp. 471, 474 (E.D. Pa. 1992), *vacated*, 20 F.3d 1250. In other words, everything happened automatically by operation of law, with no intervening discretion by a judicial officer.

> Count two alleged that the deprivation of property resulted from respondents' "malicious, wanton, willful, opressive [*sic*], [and] unlawful acts." By "unlawful," petitioner apparently meant "unlawful under state law." To say this, however, is to say that the conduct of which petitioner complained could not be ascribed to any governmental decision; rather, respondents were acting contrary to the relevant policy articulated by the State. Nor did they have the authority of state officials to put the weight of the State behind their private decision, *i.e.*, this case does not fall within the abuse of authority doctrine recognized in *Monroe v. Pape*, 365 U.S. 167 (1961). That respondents invoked the statute without the grounds to do so could in no way be attributed to a state rule or a state decision. Count two, therefore, does not state a cause of action under § 1983 but challenges only private action."

*Id.* at 941 (alterations in original). In brief, then, "private misuse of a state statute does not describe conduct that can be attributed to the State." Lower courts, accordingly, have also observed that "[a] court cannot attribute private defendants' misuse of a valid state statute to the state. An allegation that private defendants simply misused a valid state statute does not state a cause of action under § 1983" and, "[t]herefore, logically, [a private party's] filing of a complaint apparently containing falsehoods cannot be attributed to the state." *Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988) (per curiam) (citing *Lugar*, 457 U.S. at 940); *see also id.* (citing specific examples of misuse of statutes to "elicit[] . . . an exercise of official state authority").

What is evident from this examination of *Edmondson* and *Lugar*, then, is that an otherwise private actor may become a state actor where he follows—but not when he abuses—state-created procedures that either delegate the State's authority to him or allow him to invoke it in such a way that agents of the State automatically (i.e., without exercising judgment) exercise it on his behalf. The lower courts have made similar observations in reaching the conclusion that

> Plaintiff's reliance on *Lugar* and its progeny is also misplaced because *Lugar*'s "joint action" test is inapplicable to cases in which a private party is alleged to be a state actor merely because it brought suit *and invoked the independent judgment of the state judiciary. Lugar* does not contain even a passing reference to the possibility that a neutral state judge could be considered a joint actor with a private party."

*Smith*, 649 F. Supp. at 905 (emphasis added); *cf. Paisey v. Vitale*, 807 F.2d 889, 894 (11th Cir.

1986) ("Paisey seeks to find state involvement merely in the fact that the Florida state courts,

through Judge Vitale, have held themselves open to hear tort actions such as the one brought by

Nova. Such an argument assumes that the Florida courts have aligned themselves with Nova in

the state court action before they have even considered the merits of either side of this dispute.

This is an unacceptable proposition. Providing a forum for adjudication is an essentially neutral

act."); *Erb v. Judge*, No. 94-2124, 1994 WL 523209, at *2 (E.D. Pa. Sept. 23, 1994) ("The

information provided by private complainants is first reviewed by a state official before further

action is taken."), *aff'd*, 60 F.3d 814 (3d Cir. 1995).

On the basis of such a distinction, for instance, the Tenth Circuit Court of Appeals has

repeatedly "held that a private litigant's use of state court proceedings to obtain an *ex parte*

temporary restraining order does not satisfy the color of law requirement of § 1983." *Yanaki v.

Iomed, Inc.*, 415 F.3d 1204, 1208 (10th Cir. 2005) (citing *Torres v. First State Bank of Sierra

Cnty.*, 588 F.2d 1322, 1325-27 (10th Cir.1978)). And the Fifth Circuit Court of Appeals has

explained that "the simple seeking and obtaining of a temporary restraining order, or even the

action of a private party who misused a lawful state procedure with inadvertent assistance from a

state court judge," involved "an independent evaluation by the judiciary" such that "[i]t could not

be said that the private litigant was acting 'under color of state law,' nor could such a litigant be

charged with responsibility for an independent judicial decision." *Howard Gault Co. v. Tex.

Rural Legal Aid, Inc.*, 848 F.2d 544, 553-54 (5th Cir. 1988) (footnotes omitted). By contrast, that

court reasoned, a private enforcement decision that was "solely the decision of [the private

party], not that of any state official, to determine whether to execute [a] judgment," such that

"[o]nce [the private party] made that unilateral determination, state officials were compelled to

undertake the collection process," is distinguishable from cases involving *judicial decisionmaking*. *Id.* at 554.

The Third Circuit Court of Appeals' case law is consistent with these distinctions, principles, and conclusions. For instance, in cases involving the claim that store employees, by detaining suspected shoplifters, became joint actors with the police, and therefore state actors, the test asks whether "the police ha[d] a pre-arranged plan with the store" pursuant to which they would act at the employees' behest, *without independently evaluating the presence of probable cause*." *Cruz v. Donnelly*, 727 F.2d 79, 81 (3d Cir. 1984) (per curiam) (emphasis added). The Court of Appeals laid down this test, it explained, because "the critical issue [under *Lugar*] is whether the state, through its agents or laws, has established a formal procedure or working relationship that drapes private actors with the power of the state," such that the state's "system permit[s] private parties to substitute their judgment for that of a state official or body." *Id.* at 82; *accord Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984) (same, and noting that "*Lugar* is somewhat opaque"); *see Romich*, 2013 WL 5925082, at *13-14 (discussing and applying the standard from *Cruz v. Donnelly*, 727 F.2d 79); *cf. Tunstall v. Office of Judicial Support*, 820 F.2d 631, 634 (3d Cir. 1987) ("Merely instituting a routine civil suit does not transform a litigant's actions into those taken under color of state law."); *Gilbert v. Feld*, 788 F. Supp. 854, 860 (E.D. Pa. 1992) ("The conspiracy theory involves the assertedly unconstitutional consequences of joint (public and private) mis-use (or abuse) of otherwise valid state procedures, while the improper delegation theory involves the assertedly unconstitutional consequences of placing in private hands the exercise of state power.").

Moreover, the Supreme Court's statement in *Dennis v. Sparks* that "merely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator *or a*

*joint actor* with the judge," 448 U.S. at 28 (emphasis added), also supports this conclusion that while private individuals may prompt judicial decisionmaking, their invocation of state procedures to do so (e.g., by filing a PFA petition) is distinct from the judicial decisionmaking that results. "Based on this reasoning, the filing of a petition for a protection from abuse order and the petition to modify custody would also not render a private individual a state actor." *Van Tassel v. Lawrence Cnty. Domestic Relations Section*, 659 F. Supp. 2d 672, 699 (W.D. Pa. 2009), *aff'd*, 390 F. App'x 201 (3d Cir. 2010). And not only does *Dennis* foreclose a finding of joint action by "mere resort[] to the courts," the concept of conspiracy with a judge is predicated on the notion that the decisions in the case are the judge's to make, and so the question is whether he agreed with a private party intentionally to skew those decisions in that party's favor.[45]

---

[45] *See also, e.g.*, *Schucker v. Rockwood*, 846 F.2d 1202, 1205 (9th Cir. 1988) (per curiam) ("Invoking state legal procedures does not constitute 'joint participation' or 'conspiracy' with state officials sufficient to satisfy section 1983's state action requirement." (citing *Lugar*, 457 U.S. at 939 n.21)); *Cobb v. Ga. Power Co.*, 757 F.2d 1248, 1253 (11th Cir. 1985) ("[T]his case presents nothing more than a regulated utility's obtaining a TRO in state court that possibly infringed the plaintiff's rights. . . . [T]his alone does not support a decision that the defendants are liable for damages under § 1983. The district court correctly entered a summary judgment for the defendant."); *Howard Gault Co.*, 848 F.2d at 555 ("The growers cannot be held liable in a § 1983 suit simply because they filed suit under Texas statutes and obtained a temporary restraining order."); *Louisville Area Inter-Faith Comm. for United Farm Workers v. Nottingham Liquors, Ltd.*, 542 F.2d 652, 655 (6th Cir. 1976) ("We do not view Nottingham's initiation of the state proceedings to be state action."); *Spencer v. Steinman*, 968 F. Supp. 1011, 1019 (E.D. Pa. 1997) ("Here, unlike the plaintiff in *Lugar* who challenged the constitutionality of a state created procedure followed by the defendants in obtaining the prejudgment attachment, the plaintiff is challenging the conduct of a particular state actor. Under *Lugar*, therefore, a challenge based on 'abuse or misuse' of a state procedure by a state actor, such as in this case, does not state a cause of action for conspiracy under § 1983."); *Cyber Promotions, Inc. v. AOL*, 948 F. Supp. 436, 445 (E.D. Pa. 1996) ("We are troubled by the *Grandbouche* decision because it has the effect of creating government action every time a magistrate simply signs, and a trial judge enforces, a discovery order. Therefore, even if this Court had enforced a discovery order (which we have not), we would not follow the *Grandbouche* decision.").

The application of these principles here compels the conclusion that Pennsylvania's

Protection from Abuse Act, 23 Pa. Cons. Stat. Ann. §§ 6101–6122, and Ms. Kahn and her

attorneys' invocation of it, do not render Ms. Kahn and her attorneys state actors. The Protection

from Abuse Act provides that "[i]f a plaintiff petitions for temporary order for protection from

abuse and alleges immediate and present danger of abuse to the plaintiff or minor children, the

court shall conduct an ex parte proceeding." 23 Pa. Cons. Stat. Ann. § 6107. Put another way, a

PFA petitioner does not have an automatic entitlement to relief, but must instead subject herself

to a hearing before a judge, whose discretion, far from being "enlisted," "invoked," or

"directed," makes an independent determination following a hearing that, while it can be said to

be state action, can no longer be said to be the action of the private actor.

Indeed, an appreciable difference exists, in terms of ensuring the truthful allegations of abuse, between a review of the verified allegations listed in a PFA petition and the conduct of an *ex parte* hearing. A person may blithely execute a petition inflating claims of abuse. On the other hand, the process of appearing in court before a judge and swearing to testify truthfully would necessarily give one pause about leveling exaggerated or specious allegations against another person. Further, in-person examination of the petitioner during a hearing permits the trial court to inquire of facts and circumstances beyond the allegations that the victim delineated in the petition. It is, in practice, impossible for a trial court to discern from its review of pre-printed PFA form whether a petitioner has an improper motive, such as retaliation or to gain an advantage in another proceeding. In addition, as the trial court cogently highlighted in *Boyle v. Boyle*, [12 Pa. D. & C. 3d 767 (Ct. Com. Pl. 1979)], in-person hearings enable trial courts to observe the presence or absence of physical evidence of violence such as scratches, wounds, and bruises.

Finally, credibility determinations are crucial components to any trial proceeding. The trial court's ability to view the petitioner's facial expressions and mannerisms during the *ex parte* hearing is critical to an ability to render its credibility determinations. For these reasons, when compared to the requirement that an alleged victim appear before a trial court during an *ex parte* proceeding, the practice of relying upon a PFA petitioner's verification and acknowledgment that any false statements are subject to the penalties of [perjury], is inadequate protection against fabricated allegations of abuse. That shortcoming is particularly apparent in light of the only perceived benefit of in camera review, judicial economy. To be sure, assuming that the trial court convenes an ex parte hearing upon its receipt of the PFA petition . . . , the *ex parte* hearing would protect the

respondent's due process rights without delaying the immediate relief the petitioner seeks.

*Ferko-Fox v. Fox*, 68 A.3d 917, 924-25 (Pa. Super. Ct. 2013) (footnote omitted). It is thus clear that, as described by Pennsylvania's own courts, the PFA statute's procedure require the judge to consider a petitioner's allegations closely and carefully before entering a temporary order for relief. If the *Edmondson* syllogism is that the constitution of a jury is per se state action, such that a private party who exercises a peremptory challenge and, thereby, helps to determine the jury and thus engage in state action, the same logic requires concluding that a judge's decision to issue a PFA order is state action, and also the judge's decision and *ipso facto* not the private petitioner's, whose decision it is not, and whose action in petitioning, therefore, cannot be state action. The bottom line is that if a judge independently considers a PFA petition and *decides* to issue relief, his decision, unless pursuant to a conspiracy with the petitioner, is indeed his own, and thus state action not attributable to the petitioner, whose action of petitioning is thus not attributable to the state and, therefore, is not state action.

Finally, Mr. Mikhail's allegations and arguments, to the extent that they remain, would seem really to be a claim that Ms. Kahn and her attorneys have engaged in misconduct before the state tribunals. But a PFA petitioner's *misuse* of the PFA procedures is not actionable under § 1983, pursuant to the Supreme Court's clear statement to that effect in *Lugar*. The allegations here are really no more than claims that Ms. Kahn and other otherwise private party Defendants committed fraud upon the Pennsylvania courts in terms of what they stated to be facts in the PFA and custody proceedings. Setting to one side the logical fact that fraud upon a court would seem to preclude conspiracy with the court, the Court notes that the Pennsylvania Protection from Abuse Act provides that "[a] person who knowingly gives false information to any law enforcement officer with the intent to implicate another under [the Protection from Abuse Act]

77

commits an offense under 18 Pa.C.S. § 4906 (relating to false reports to law enforcement authorities)." 23 Pa. Cons. Stat. Ann. § 6106; *see id.* § 6122 ("Nothing in this chapter shall be construed to preclude an action for wrongful use of civil process pursuant to 42 Pa.C.S. Ch. 83 Subch. E (relating to wrongful use of civil proceedings) or criminal prosecution for a violation of 18 Pa.C.S. Ch. 49 (relating to falsification and intimidation)."). In other words, when a PFA petitioner commits fraud upon the court, she acts in violation of state law, and her action can thus hardly be said to be attributable to the State. *See Lugar*, 457 U.S. at 940; *see also, e.g.*, *Dahlberg v. Becker*, 748 F.2d 85, 90-91 (2d Cir. 1984) ("This allegation did not ascribe conduct to any state governmental decision or action. Instead, it implicitly legitimized the state statute and complained only that the private party defendants had run afoul of the statute. . . .").

### E. Failure to State a Claim

Mr. Mikhail's claims against several of the Defendants must be dismissed because Mr. Mikhail has failed to state claims against them.

#### 1. Mr. Mikhail Has Failed to State a Claim Against Either Sheila Dugan or Chip Minto

Mr. Mikhail fails to state a cause of action against either Sheila Dugan or Chip Minto.[46]

Mr. Mikhail's only factual allegations against Ms. Dugan, two in total, concern testimony she

---

[46] Ms. Dugan's Motion to Dismiss (Docket No. 33), by incorporation of Ms. Kahn and Mr. Fellheimer's Motion to Dismiss, challenges the sufficiency of Mr. Mikhail's conspiracy allegations and contends he has failed to state a claim. Chip Minto appears not to have been served, but the Court will dismiss the claims against him on its own motion because Mr. Mikhail was on notice of their infirmity because other Defendants, including Ms. Dugan by incorporation, had moved to dismiss on these grounds. *See Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980) ("The district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action."); *Nagy*, 2012 WL 1858983, at *1; *see also Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 223-24 (3d Cir. 2004) (holding that notice for *sua sponte* dismissal is sufficient where "the targeted party had reason to believe the court might reach the issue and

ostensibly gave, but Mr. Mikhail claims no wrongdoing in those averments. *See* Compl. at 13,

19-20. Without anything more, Mr. Mikhail then states that Ms. Dugan "conspired with Ms.

Kahn in order to inflict harm" on Mr. Mikhail. Compl. ¶ 180–182. These later allegations are

wholly conclusory and, as discussed earlier in the context of what is required to state plead a

conspiracy under § 1983, *see supra* subsection III.D.2, these allegations, being wholly

conclusory, cannot be credited. Any claims against Ms. Dugan must be dismissed without

prejudice.

Mr. Mikhail has leveled even fewer allegations against Mr. Minto—just the same three

numbered points conclusorily asserting that Mr. Minto "conspired with Ms. Kahn in order to

inflict harm" on Mr. Mikhail. Compl. ¶180–182. *A fortiori*, any claims against Mr. Minto must

be dismissed without prejudice.

### 2.  Mr. Mikhail Has Failed to State a Claim Against Preston Findlay

For several reasons, Mr. Mikhail also fails to state a cognizable claim for relief against

Mr. Findlay, counsel for the Missing Children Division of the National Center for Missing and

Exploited Children ("NCMEC"), a nonprofit organization that receives congressional funding.[47]

Mr. Mikhail alleges that Mr. Findlay "provided an affidavit [in the state court proceedings]

profiling child kidnappers and tailored to fit the goals of Ms. Kahn and Ms. Phillips." Compl.

¶ 38. For one, Mr. Findlay is likely immune for his submission of this affidavit. *See Williams v.*

*Hepting*, 844 F.2d 138, 142-43 (3d Cir. 1988) (citing with approval *Sprecher v. Graber*, 716 F.2d

---

received a fair opportunity to put its best foot forward" (citations and internal quotation marks
omitted)).

As to Ms. Dugan and Ms. Minto, see also *supra* note 37.

[47] Because Mr. Mikhail has not stated a claim against Mr. Findlay, the Court need not
consider the implications of NCMEC's congressional funding on whether NCMEC may be
considered a federal actor. *Cf., e.g.*, *Heinrich v. Sweet*, 62 F. Supp. 2d 282, 310-11 (D. Mass.
1999) (citing cases).

968, 975 (2d Cir. 1983), in which the court found immunity for an SEC official's submission of

an affidavit). Second, even if Mr. Findlay is not entitled to such immunity, and even if the Court

were to assume, further, that Mr. Findlay is a federal government actor (i.e., for *Bivens*

purposes[48]) based on congressional funding to the NCMEC (a proposition that this Court need

not and will not determine), Mr. Mikhail has not alleged any particular cause of action or any

particular constitutional right of his that Mr. Findlay allegedly violated.

Although the Court acknowledges that pro se complainants cannot be held to the exacting

standards of artful pleading as may be applied to learned counsel, Mr. Mikhail's Complaint fails

to put Mr. Findlay (or the Court) on notice of even the most ephemeral nature of Mr. Mikhail's

claims against Mr. Findlay. Federal Rule of Civil Procedure 8(a) requires a complaint to include

"'a short and plain statement of the claim' that will give the defendant fair notice of what the

plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant Cnty. Narc.*

*Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) (quoting *Conley v. Gibson*, 355 U.S. 41,

47 (1957)); *see, e.g.*, *Albrecht*, 233 F. App'x at 125. He has not done so. Other than accusing Mr.

Findlay of conspiring with Ms. Kahn, Mr. Mikhail has not claimed any actionable wrongdoing

on the part of Mr. Findlay.

But Mr. Mikhail has also failed to plead Mr. Findlay's supposed involvement in a

conspiracy with any of the required specificity, as discussed above, *see supra* subsection III.D.2.

Instead, he offers the mere conclusory allegation that Mr. Findlay "conspired with Ms. Kahn to

inflict harm to Plaintiff," Compl. at 30, without, "even," any "'basic facts' in support of his

allegation that [Mr. Findlay] worked 'in collusion' with [Ms. Kahn]," *Albrecht*, 233 F. App'x at

125 (quoting *In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005)). There is nothing from

---

[48] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

which this Court could plausibly infer an agreement "to deprive [Mr. Mikhail] of his constitutional rights." *Id.* Mr. Mikhail has stated only that Mr. Findlay "[p]rovid[ed] an affidavit . . . that is totally racist" and "contain[s] falsehoods and misleading information" and that he "[a]ccus[ed Mr. Mikhail] of being a potential kidnaper [sic] through profiling." Compl. ¶¶ 146–51. These allegations, of course, are mere conclusions about the verifiable content of a document; moreover, it is unclear just what federal constitutional or statutory rights Mr. Mikhail believes Mr. Findlay violated.

But the Court need not accept Mr. Mikhail's characterizations of Mr. Findlay's affidavit, and not only because they are mere conclusions, but also because the Court can examine the affidavit for itself to determine whether Mr. Mikhail's allegations are entitled to the presumption of truth. Although Mr. Mikhail neglected to attach the affidavit to his Complaint, because Mr. Findlay attached it in his Motion to Dismiss (Docket Nos. 39, 39-3) and Mr. Mikhail does not contest the affidavit's authenticity in his Response, *see* Resp. to Findlay Mot. Dismiss ¶ 4 (Docket No. 40) ("It is true that Mr. Findlay provided a lone four-page affidavit . . . ."), the affidavit comes properly before the Court. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." (citations omitted)); *accord Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002); *Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 253 n.3 (3d Cir. 2010). Mr. Findlay's affidavit does not mention Mr. Mikhail or his child once. Rather, it provides general information about child abduction and how parents can protect their children, as well as relevant information regarding

Egypt. *See* Findlay Aff., Findlay Mot. Dismiss Ex. 1 (Docket No. 39-3). It is difficult to see how any of the information in the affidavit can be construed as materially false or racist.

Accordingly, because Mr. Mikhail concedes that this affidavit constitutes the only means by which Mr. Findlay harmed him, and because, regardless, Mr. Findlay likely has immunity for his submission of the affidavit, any claims against Mr. Findlay are dismissed with prejudice because amendment would be futile. *See* Resp. to Findlay Mot. Dismiss ¶ 4 ("It is true that Mr. Findlay provided a lone four-page affidavit, but it is not the quantity of affidavits or the length of them that matter but what they contain. Mr. Findlay caused harm to Plaintiff and violated his constitutional rights with this lone document as described in the Complaint.").[49]

\*   \*   \*

Mr. Mikhail's claims against several other Defendants could also be dismissed for failure to state a claim. For instance, he does not state a claim against Dr. Pisa,[50] and likely does not

---

[49] Among other defenses, Mr. Findlay also asserts congressionally conferred immunity under 18 U.S.C. § 2258D, but given that Mr. Mikhail has failed to state a claim against Mr. Findlay, this Court will not construe that statute. It is enough to note that determining whether such immunity would apply would involve not only at least one issue of construction of a statute that has not yet been interpreted by any court, but also an issue of fact, namely, whether Mr. Findlay acted with a certain type of intent, *see id.*, and would thus likely be unresolvable at the motion to dismiss stage. Such endeavors are unnecessary and would be wasteful of the litigants' and Court's resources and time for no purpose in this instance.

[50] Mr. Mikhail offers a handful of allegations against Dr. Pisa, the court-appointed reunification therapist. He alleges that Dr. Pisa conspired with Ms. Kahn to deprive him of his constitutional rights by meeting *ex parte* with the court; not being honest with the court regarding, on the one hand, Ms. Kahn's failure to cooperate with him and, on the other, the presence of parental alienation; and failing to submit a court-ordered reunification plan. These allegations do not state a claim upon which relief can be granted, at least not under § 1983. Mr. Mikhail has provided no specifics, and what Mr. Mikhail characterizes as dishonesty and *ex parte* meetings, without more, cannot reasonably be construed as anything more than an expert's expression of his opinion, none of which constitutes a constitutional violation (or a plausible suggestion of conspiracy). Likewise, Dr. Pisa's failure to submit a report cannot form the basis of a federal claim. The claims against Dr. Pisa must therefore be dismissed without prejudice for failure to state a claim

against Ms. Sobel, either. But the Court need not reach this issue, because Dr. Pisa and Ms.

Sobel, like the defendant judges, are also protected by absolute immunities, and *Younger*

abstention additionally precludes any injunctive relief as requested against them. It is to those

immunity defenses that the Court next turns.

### F.      Immunities and Capacities

To the extent that any federal claims for damages or injunctive relief against the

defendant judges or the court-appointed Defendants, for their actions in their court-appointed

roles, survive *Rooker–Feldman*, *Younger* abstention, and the other defenses discussed above,

these Defendants have absolute immunity from Mr. Mikhail's claims which requires dismissal of

the claims with prejudice.

#### 1.   Absolute Judicial Immunity from Suit for Monetary Damages

The defendant judges assert that they have absolute immunity from money damages. Mr.

Mikhail contests this immunity. He claims that judicial immunity for misconduct and fraudulent

activities violates his constitutional rights, and he also seems to contest the appropriateness of

judicial immunity where judges act maliciously and in bad faith. Resp. to Judges' Mot. Dismiss

(Docket No. 25). Although this Court does not find that any of Mr. Mikhail's conspiracy or bad

faith allegations against the judges are anything more than conclusory, *see also supra* subsection

III.D.2, it will dismiss with prejudice any remaining damages claims against the judges because

of judicial immunity.

Judges are absolutely "immune from suit under section 1983 for monetary damages

arising from their judicial acts." *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 768 (3d Cir.

2000) (citing *Mireles v. Waco*, 502 U.S. 9, 9 (1991); *Forrester v. White*, 484 U.S. 219, 225-27

(1988); *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978)); *see also Azubuko v. Royal*, 443 F.3d

302, 303 (3d Cir. 2006) (per curiam). This immunity, and the reasons for it, are well established

by the decisions of the Supreme Court and the courts of appeals, including the Third Circuit

Court of Appeals, *see, e.g.*, *Gallas*, 211 F.3d at 768-69, so this Court will not rehash those

principles here. It suffices to say that so long as (1) the judge's actions are taken in his judicial

capacity (determined by the nature of the acts themselves) and (2) the judge has some semblance

of jurisdiction over the acts, he will have immunity for them. *See id.* Conceptual difficulty, if

there is any, pertains "primarily [to] attempting to draw the line between truly judicial acts, for

which immunity is appropriate, and acts that simply happen to have been done by judges."

*Forrester*, 484 U.S. at 227.

      Neither exception can be argued credibly here. All of the judges' acts that Mr. Mikhail

challenges took place in the PFA, custody, and divorce proceedings. Even if they take place *ex*

*parte* and without notice or a hearing, acts may still be judicial in nature. *Stump v. Sparkman*,

435 U.S. 349, 360 (1978). And "[c]ourts applying *Stump v. Sparkman* have interpreted the Court

as requiring a showing of an absence of *subject matter* jurisdiction to defeat a judge's assertion

of immunity." *Dykes v. Hosemann*, 776 F.2d 942, 948 (11th Cir. 1985) (per curiam) (emphasis

added) (*citing Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 336 (1872)[51]); *accord Gallas*, 211 F.3d

at 769. Thus, the judges here had the requisite jurisdiction if and when they engaged the conduct

Mr. Mikhail alleges. *See* 42 Pa. Cons. Stat. Ann. § 931(a) ("unlimited original jurisdiction"); 23

Pa. Cons. Stat. Ann. § 3104 (divorce and custody); 23 Pa. Cons. Stat. Ann. §§ 6101–6122

(Protection from Abuse Act); 42 Pa. Cons. Stat. § 742 (appellate jurisdiction). It cannot be

---

[51] *See Bradley*, 80 U.S. (13 Wall.) at 336 ("Judges of courts of record of superior or general
jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess
of their jurisdiction, and are alleged to have been done maliciously or corruptly. A distinction as
to their liability made between acts done by them in excess of their jurisdiction and acts done by
them in the clear absence of all *jurisdiction over the subject-matter*." (emphasis added)).

contended otherwise. *See Gallas*, 211 F.3d at 769 ("[W]e must distinguish between acts in the

'clear absence of all jurisdiction,' which do not enjoy the protection of absolute immunity, and

acts that are merely in 'excess of jurisdiction,' which do enjoy that protection . . . ." (citing

*Stump*, 435 U.S. at 356 n.6)).

Mr. Mikhail's allegations of bad faith and conspiracy, even if true, would not deprive the

judges of this immunity. *See, e.g.*, *Mireles*, 502 U.S. at 11 ("[J]udicial immunity is not overcome

by allegations of bad faith or malice . . . ."); *Stump*, 435 U.S. at 356 ("A judge will not be

deprived of immunity because the action he took was in error, was done maliciously, or was in

excess of his authority . . . ."); *Dennis*, 449 U.S. at 28-29 (immunity applies even if a judge

conspired with litigants); *Gallas*, 211 F.3d at 770 ("In *Stump*, the Supreme Court held that a

judge was absolutely immune with respect to his approval of a mother's ex parte petition for an

order permitting the sterilization of her mentally challenged daughter."). And the fact that any

order may have been issued "ex parte, without notice to [Mr. Mikhail] or an opportunity for him

to be heard, does not mean that [the judge's] act was not judicial." *Gallas*, 211 F.3d at 770.

For these reasons, Mr. Mikhail's damages claims against the judges brought pursuant to

§ 1983 are dismissed with prejudice. *See also, e.g.*, *Shahin v. Darling*, 350 F. App'x 605, 607 (3d

Cir. 2009) (per curiam) ("Despite Shahin's numerous allegations, there are no facts in the

complaint to support inferences that any of the named judges acted outside the scope of his or

her judicial capacity or in the absence of jurisdiction."); *Gallas*, 211 F.3d at 772 ("Gallas'

allegations that Judge Sylvester ordered the release of the PFA 'for no judicial purpose and for

the sole purpose of injuring the reputation of [Gallas]' and that Judge Sylvester 'was motivated

by a non-judicial intent to undermine [Gallas'] moral authority as Executive Administrator, and

to assist political opponents of [Gallas] in terminating his employment' are irrelevant, as judicial

immunity is not forfeited by allegations of malice or corruption of motive." (alterations in

original) (citations and internal quotation marks omitted)).

### 2.   Judicial Immunity from Injunctive Relief and Adequacy of Remedies at Law

Mr. Mikhail's claim for injunctive relief against the judges must also fail. As the Third

Circuit Court of Appeals has explained:

> In 1996, Congress amended 42 U.S.C. § 1983 to provide that "injunctive relief shall not be granted" in an action brought against "a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000) (explaining that the amendment applies to both state and federal judges). Because Azubuko has not alleged that a declaratory decree was violated or that declaratory relief is unavailable, and because the injunctive relief sought by Azubuko does not address the actions of Judge Royal other than in his judicial capacity, his claim for injunctive relief is barred.

*Azubuko*, 443 F.3d at 303-04 (citations omitted). This Court has been unable to find any case

holding otherwise.[52]

---

[52] Examples of dismissals of injunctive relief claims on the grounds of judicial immunity abound. *See, e.g., Clark v. Punshon*, 516 F. App'x 97, 99 (3d Cir. 2013) (per curiam) ("With respect to Clark's claims against Judge Capuzzi, we agree with the District Court that absolute judicial immunity precludes Clark's claims for injunctive relief."); *Bukovinsky v. Pennsylvania*, 455 F. App'x 163, 165-66 (3d Cir. 2011) (per curiam) ("[A] claim for injunctive relief against the judicial officers would be barred by the language of § 1983, and Bukovinsky has not alleged that a declaratory decree was violated or that declaratory relief was unavailable."); *Chadwick v. Court of Common Pleas*, 244 F. App'x 451, 455 (3d Cir. 2007) (per curiam) ("Chadwick does not argue that the statutory exceptions set out in this provision should apply, and we agree with the District Courts determination that the challenged actions of the judges of the Court of Common Pleas fell within the range of judicial action."); *Robinson v. Smyth*, 258 F. App'x 469, 470 (3d Cir. 2007) (per curiam) ("Robinson's claims for injunctive relief against Judge Smyth were also barred because Robinson did not allege that the judge violated a declaratory decree or that declaratory relief was not available in his case."); *Catanzaro v. Cottone*, 228 F. App'x 164, 167 (3d Cir. 2007) (per curiam) ("Under the 1996 amendments to § 1983, injunctive relief against judicial officers for acts or omissions taken in the officer's judicial capacity 'shall not be granted' unless a declaratory decree was violated or declaratory relief was unavailable. *See* 42 U.S.C. § 1983. . . . Catanzaro's Complaint is devoid of any allegation that declaratory relief is unavailable or that a declaratory decree has been denied, and, thus, his claim for injunctive relief is barred." (citation omitted)); *Shallow v. Rogers*, 201 F. App'x 901, 904 n.4 (3d Cir. 2006) (per

Moreover, even before the 1996 amendments to § 1983, which superseded the Supreme Court's holding in *Pulliam v. Allen*, 466 U.S. 522, by severely restricting the availability of injunctive relief against judges, a plaintiff seeking injunctive relief against a judge in the judge's individual capacity still had to demonstrate that there was no "adequate remedy at law, rendering equitable relief inappropriate." *Pulliam*, 466 U.S. at 542; *accord, e.g.*, *Chadwick v. Court of Common Pleas*, 244 F. App'x 451, 455 (3d Cir. 2007) (per curiam) ("Moreover, even if such claims were not barred by judicial immunity, Chadwick has not demonstrated 'an inadequate remedy at law,' *see Pulliam*, 466 U.S. at 537-38."); *Bolin*, 225 F.3d at 1242-43. Such adequate remedies includes appellate review. *See Pulliam*, 466 U.S. at 543 n.22.[53]

As already discussed at length above, Mr. Mikhail not only *can* appeal PFA and custody judgments against him (or could have), but, as his allegations themselves indicate, he *has done so*. His adequate remedies at law are yet a further reason that his § 1983 claims against the judges must be dismissed with prejudice.

### 3.   Absolute Quasi-Judicial Immunity for the Court-Appointed Defendants

Mr. Mikhail also brings claims against Drs. Lustig and Pisa and Ms. Sobel. As discussed above, the Court is dismissing with prejudice the § 1983 claims against Dr. Lustig because the

---

curiam) ("To the extent that Shallow sought injunctive and declaratory relief against Judge Rogers, the claims were also properly dismissed."); *Corliss*, 200 F. App'x at 84-85 ("To the extent that Corliss seeks injunctive relief, the 1996 amendment to § 1983 bar Corliss's claims for injunctive relief against the state court judges.").

[53] *See also, e.g.*, *Newsome v. Merz*, 17 F. App'x 343, 345 (6th Cir. 2001) ("If he fails to prevail in case No. 99-473, Newsome can appeal that judgment as well. Thus, Newsome had or has adequate remedies at law to address Magistrate Judge Merz's alleged misdeeds." (citing *Pulliam*, 466 U.S. at 541-42)); *Bolin*, 225 F.3d at 1242-43; *Smith v. Stark*, 777 F. Supp. 2d 795, 800 (D. Del. 2011) ("*Bolin* emphasizes that injunctive relief ought not be granted to plaintiffs who have adequate remedies at law. Plaintiff has adequate remedies in both State and Federal court by right of appeal." (citation omitted)); *Leisure v. Frost*, No. 07-968, 2008 WL 4186226, at *3 (S.D. Ohio Sept. 8, 2008) ("[B]ecause plaintiff can appeal any final judgment entered in *Leisure v. Reynoldsburg*, she cannot, as a matter of law, demonstrate a right to injunctive relief in this action.").

statute of limitations has run, *see supra* Section III.C. The Court now also dismisses with

prejudice any damages claims under § 1983 against Dr. Pisa and Ms. Sobel because they have

absolute quasi-judicial immunity for their acts pursuant to their court-appointed roles. Further, to

the extent that Mr. Mikhail's claims under § 1983 for injunctive relief against Dr. Pisa and Ms.

Sobel may survive *Younger* abstention (they do not currently evade *Younger* abstention, but it is

not inconceivable that they could do so in an amended pleading), they, too, must be dismissed,

albeit without prejudice, on the grounds of quasi-judicial immunity.

The Third Circuit Court of Appeals explained the basis of absolute immunity for officials

performing judicial functions in *Williams v. Consovoy*, 453 F.3d 173 (3d Cir. 2006):

> While § 1983 makes no mention of an immunity defense, an official is
> immune from a § 1983 suit if she was "accorded immunity from tort actions at
> common law when the Civil Rights Act was enacted in 1871." *Malley v. Briggs*,
> 475 U.S. 335, 340 (1986). Nevertheless, even if an official did not enjoy absolute
> immunity at common law, she may still be entitled to absolute immunity if she
> performs "special functions" that are analogous to those functions that would
> have been immune from tort actions at the time Congress enacted § 1983. *Hughes
> v. Long*, 242 F.3d 121, 125 (3d Cir. 2001) (citing *Butz v. Economou*, 438 U.S.
> 478, 506, 508 (1978)). This immunity "was and is considered necessary 'to assure
> that judges, advocates, and witnesses can perform their respective functions
> without harassment or intimidation.'" *McArdle v. Tronetti*, 961 F.2d 1083, 1084
> (3d Cir. 1992) (Alito, J.) (quoting *Butz,* 438 U.S. at 512). Accordingly, absolute
> immunity attaches to those who perform functions integral to the judicial process.
> *Burns v. Reed*, 500 U.S. 478, 484 (1991).
>
> Under this "functional" approach, courts look to the nature of the functions
> being performed by the actor in question and evaluate the effect that exposure to
> liability would have on an appropriate exercise of that function. *Hughes*, 242 F.3d
> at 125. Applying this approach, courts conclude that individuals who perform
> investigative or evaluative functions at a governmental adjudicative entity's
> request to assist that entity in its decisionmaking process are entitled to absolute
> immunity. *See McArdle*, 961 F.2d at 1085 (psychiatrist who performed evaluation
> of prisoner at court's request entitled to absolute immunity); *Morstad v. Dep't of
> Corr. & Rehab.*, 147 F.3d 741, 744 (8th Cir. 1998) (psychologist who performed
> evaluation of sex offender at court's request entitled to absolute immunity).
>
> Applying this "functional" approach, we conclude that [defendant
> psychologist appointed by the New Jersey State Parole Board] performed a
> function integral to the judicial process and is therefore situated similarly to the
> mental health professionals in *McArdle* and *Morstad* to whom absolute immunity

> from § 1983 claims attached. Like those individuals, Gibbons performed an evaluation and presented his findings to the adjudicative Parole Board, which then relied on his report and expertise in reaching its ultimate decision to deny Williams parole. Like the District Court, we believe that by preparing his report at the Parole Board's request to assist in its decision-making, Gibbons acted as "an arm of the court," *McArdle*, 961 F.2d at 1085, and is therefore entitled to absolute immunity from Williams's § 1983 action.

*Williams*, 453 F.3d at 178; *see also, e.g.*, *Bodle v. Linhardt*, No. 12-02425, 2013 WL 2481250, at *13 (M.D. Pa. June 10, 2013) ("Defendant Velkoff performed the evaluation and diagnosis of Bodle as part of . . . a function integral to the judicial process and is therefore, like the mental health professionals in *Williams* and *McArdle*, shielded by absolute immunity."); *Lewis v. Foster*, No. 04-1350, 2008 WL 4224609, at *8 (D. Del. Sept. 16, 2008) ("Dr. Foster is entitled to absolute immunity for [her] psychiatric evaluation of Lewis at the request of the Superior Court of the State of Delaware [because she was] functioning as an arm of the court, and as such, she was an integral part of the judicial process and is protected by the same absolute judicial immunity that protects judges."); *Faraldo v. Kessler*, No. 08-0261, 2008 WL 216608, at *5 (E.D.N.Y. Jan. 23, 2008) ("Friedman is entitled to absolute immunity because, as court evaluator . . . , she acted as an arm of the court, similar to a guardian ad litem or a court-appointed doctor or psychologist, a non-judicial person who fulfills a quasi-judicial role at the court's request." (internal quotation marks and alterations omitted) (quoting *Hughes*, 242 F.3d at 126)). The reason for such immunity is that "[p]sychologists and other experts would be reluctant to accept court appointments if they thereby opened themselves to liability for their actions in this official capacity." *Doe v. Hennepin County*, 623 F. Supp. 982, 986 (D. Minn. 1985).

This quasi-judicial immunity that protects court-appointed doctors, psychologists, or custody evaluators when they "function[] as an arm of the court" is "the same absolute judicial immunity that protects" judges. *McArdle*, 961 F.2d at 1085. They are absolutely immune

whether they acted intentionally, committed perjury, or conspired to testify falsely under oath. *See id.* at 1085-86. And, more generally, as with absolute immunity for judges themselves, as discussed above, "if persons are immune from Section 1983 liability for their acts by virtue of their function in the judicial process, they must be immune from Section 1983 liability for conspiring to do those acts." *Id.* (citing cases in accordance from other circuits). "Otherwise, judges, prosecutors, witnesses and others 'on mere allegations of conspiracy or prior agreement, could be hauled into court and made to defend their judicial acts, the precise result judicial immunity was designed to avoid.'" *Id.* at 1086 (quoting *Ashelman v. Pope,* 793 F.2d 1072, 1077 (9th Cir. 1986)). Even where the claim is that the individual defrauded the court itself, the individual remains immune. *See, e.g.*, *Vernon v. Rollins-Threats*, No. 04-1482, 2005 WL 3742821, at *5 (N.D. Tex. Nov. 2, 2005) ("Plaintiff claims that Defendant is not protected by derived judicial immunity because her actions in not being a licensed, competent, qualified Psychologist mean that she acted beyond the scope of her appointment by the state court and defrauded it. Plaintiff's arguments are without merit." (footnote omitted).

Further, even if they did not have quasi-judicial immunity, the court-appointed Defendants in this case would be protected, inasmuch as the claims relate to their testimony or submissions to the state courts, by absolute witness immunity, which serves as a shield even against allegations of perjury and conspiracy. *See, e.g.*, *McArdle*, 961 F.2d at 1085 (citing *Gardner v. Parson*, 874 F.2d 131, 146 (3d Cir. 1989)); *Watterson v. Page*, 987 F.2d 1, 7 (1st Cir. 1993) ("And even assuming Seymour testified falsely, and even assuming her false testimony might otherwise give rise to a claim of constitutional dimensions, she would still be immune from suit under § 1983 because of the absolute immunity afforded to witnesses for their testimony in the course of judicial proceedings."); *Mitchell v. City of Boston*, 130 F. Supp. 2d

201, 210 (D. Mass. 2001) ("In the wake of the Supreme Court's holding in *Briscoe*[ *v. LaHue*, 460 U.S. 325 (1983)], most circuits have rejected § 1983 claims alleging that the defendants who were testifying witnesses were not entitled to absolute immunity because they were engaged in a conspiracy with each other or with the prosecutor to offer perjurious testimony in a criminal case against the plaintiff." (citing cases)); *cf. Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir. 1992) ("Consideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity. . . .").

Finally, the Court notes again that *Younger* abstention—not to mention Mr. Mikhail's likely failure to state a claim against Dr. Pisa or Ms. Sobel[54]—bars the Court from hearing Mr. Mikhail's requests for injunctive relief against these individuals under § 1983. But even if Mr. Mikhail could find a way to replead allegations against either Dr. Pisa or Ms. Sobel that somehow could both escape the *Younger* bar as well as state a proper claim, the 1996 amendments to § 1983 granting judges immunity from injunctive relief *may* also apply to the functioning arms of the court, for the same reasons these individuals have long had immunity from money damages.[55] After all, "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are functionally comparable to those of judges—that is,

---

[54] *See supra* note and 50 accompanying text.

[55] Few courts seem to have addressed this question, largely because they have been able to dispose of the claims on other grounds. *See, e.g.*, *Hili v. Sciarrotta*, 140 F.3d 210, 215 (2d Cir. 1998) ("It is not clear from the language of the amendment or from our cursory review of the legislative history whether the new restriction on the granting of injunctive relief against 'judicial officers' was meant to extend to other officials whose entitlement to absolute immunity from damages had been recognized in light of their roles in judicial proceedings. We need not decide in the present case, however, whether the amendment would make probation officers immune from injunctive relief in connection with their presentence report duties, for we conclude that Hili's complaint, alleging that the [presentencing report] contains hearsay and statements that are inaccurate, was properly dismissed because it failed to state a claim on which injunctive relief can be granted against Sciarrotta and Eich."). This Court will take the same approach here and defer any such ruling unless and until the time at which it may become necessary and, thus, appropriate.

because they, too, exercise a discretionary judgment as a part of their function." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993) (alterations, citation, and internal quotation marks omitted); *accord, e.g.*, *Kulesa v. Rex*, 519 F. App'x 743, 746 (3d Cir. 2013) (per curiam), *cert. denied*, 134 S. Ct. 295 (2013). Such discretionary judgment is exactly what a custody evaluator or reunification therapist is asked to employ.

Moreover, Mr. Mikhail cannot claim, as against the court-appointed Defendants, that he lacked an adequate remedy at law. As with his claims against the judges for injunctive relief, he could always appeal any rulings erroneously crediting the court-appointed Defendants' testimony or submissions to the Pennsylvania Superior Court (in addition to raising those arguments before the trial court in the first instance). While amendment would likely be futile, the Court will dismiss the claims for injunctive relief against Dr. Pisa and Ms. Sobel without prejudice on the slim chance that Mr. Mikhail can present good faith averments that show *Younger*'s exceptional circumstances such that his remedy at law might also be inadequate.

### 4. The Eleventh Amendment Bars Suit for Monetary Damages and Retrospective Injunctive Relief Against the Judiciary

To the extent that Mr. Mikhail's § 1983 damages claims against the judges can be construed as claims against the courts themselves (i.e., as claims brought against the judges in their official capacities, *see Hafer v. Melo*, 502 U.S. 21, 26 (1991)), these claims are dismissed with prejudice as barred by Eleventh Amendment sovereign immunity. *See, e.g.*, *Benn v. First Judicial Dist.*, 426 F.3d 233, 241 (3d Cir. 2005); *Callahan v. City of Philadelphia*, 207 F.3d 668, 673-74 (3d Cir. 2000). So too are any claims for retrospective injunctive relief. *E.g.*, *Green v. Mansour*, 474 U.S. 64, 68 (1985). Additionally, even prospective relief may often not be available. *See, e.g.*, *id.* at 72 ("The propriety of issuing a declaratory judgment may depend upon equitable considerations, and is also informed by the teachings and experience concerning the

92

functions and extent of federal judicial power." (citations and internal quotation marks omitted)

(citing, inter alia, *Younger*, 401 U.S. at 44-45)).

### G.     The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims

Because all of Mr. Mikhail's federal claims have been dismissed, the Court will decline

to exercise jurisdiction over his remaining state law claims (Counts III through VI). *See* 28

U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over

a claim . . . if the district court has dismissed all claims over which it has original

jurisdiction . . . ."). "[W]here the claim over which the district court has original jurisdiction is

dismissed before trial, the district court *must decline* to decide the pendent state claims unless

considerations of judicial economy, convenience, and fairness to the parties provide an

affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d

Cir. 1995) (emphasis added); *accord United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726

(1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial

in a jurisdictional sense, the state claims should be dismissed as well."). There is no reason Mr.

Mikhail cannot refile his state claims in Pennsylvania state court, and, therefore, he cannot show

such prejudice as is necessary to require this Court to exercise supplemental jurisdiction. *See,

e.g.*, *Shaffer v. Bd. of Sch. Dirs.*, 687 F.2d 718, 723 (3d Cir. 1982) ("[T]he pendent state law

claim should be dismissed unless the court finds that some prejudice to the plaintiff class would

result other than the necessity for filing a state court lawsuit. The fact that some investment of

time has already been made does not foreclose a district court judge from exercising discretion in

favor of not hearing a pendent state claim."); *Shaffer v. Bd. of Sch. Dirs.*, 730 F.2d 910, 912 (3d

Cir. 1984) ("[P]endent jurisdiction should be declined where the federal claims are no longer

viable, absent extraordinary circumstances." (citations and internal quotation marks omitted)).[56]

---

[56] Nonetheless, the Court feels compelled to point out that Mr. Mikhail's claims purportedly brought under the Pennsylvania Code of Judicial Conduct and those under the Pennsylvania Rules of Professional Conduct are frivolous under established Pennsylvania law.

The fact that a judge or attorney's conduct might violate Pennsylvania's ethics rules does not itself grant the allegedly aggrieved individual a right to sue. The Code and Rules provide standards to which the Pennsylvania Supreme Court holds judges and lawyers, respectively, and which it enforces through its own disciplinary proceedings. But neither the Code nor the Rules confers any right upon private litigants to bring suit or authorizes a cause of action.

The law here is well settled by the Pennsylvania Supreme Court. The Code of Judicial Conduct "does not confer substantive rights upon the parties to the litigation in question." *Goodheart v. Casey*, 565 A.2d 757, 762 (Pa. 1989). Rather, "[t]he Code of Judicial Conduct . . . provides standards of conduct to be referred to by a judge in his self-assessment of his conduct as a jurist. If the norm of conduct set for judges is violated, that is a matter for this Court to address under the powers vested in it pursuant to Article 5, section 18 of the Constitution of this Commonwealth"—i.e., it is a matter for the Commonwealth's Judicial Conduct Board, not lower courts or federal courts in private litigation. *Id.*; *see* Pa. Const. art. 5, § 18. Similarly, "simply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277, 1284 (Pa. 1992). "The law is clear that the Codes and Rules of Professional Responsibility may not be used" to establish civil liability. *Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz*, 573 A.2d 1001, 1004 (Pa. 1990); *see also In re Estate of Pedrick*, 482 A.2d 215, 217 (Pa. 1984).

Further, even if the Pennsylvania Supreme Court had not provided this guidance, it is clear from two other sources of law that neither an action against the judges, purportedly under the Code of Judicial Conduct, nor an action against any attorneys, purportedly under the Rules of Professional Conduct, may be maintained. First, judicial immunity would most likely foreclose an action based on the Code of Judicial Conduct. *See, e.g.*, *Beam v. Daihl*, 767 A.2d 585, 586 (Pa. Super. Ct. 2001). Second, the Rules of Professional Conduct themselves disclaim any right to sue based on their violation:

> *Violation of a Rule should not itself give rise to a cause of action against a lawyer* nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. *They are not designed to be a basis for civil liability.* Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek

**CONCLUSION**

For the foregoing reasons, the Defendants' Motions to Dismiss (Docket Nos. 9, 18, 21, 22, 23, 33, 38, 39) are granted, and Mr. Mikhail's Complaint is dismissed in its entirety.

The *Rooker–Feldman* dismissal is with prejudice as to all harms resulting from the PFA orders themselves, and without prejudice as to harms resulting from an alleged conspiracy in which the defendant judges participated. The *Younger* abstention dismissal is without prejudice. All claims purportedly brought under 18 U.S.C. § 242 are dismissed with prejudice because Mr. Mikhail, as a private individual, cannot initiate a criminal action or compel the state or federal authorities to bring one. And all claims against the defendant judges are dismissed with prejudice on the grounds of judicial immunity; similarly, the damages claims against Dr. Pisa and Ms. Sobel must be dismissed with prejudice, and the claims for injunctive relief against them, without prejudice. Section 1983's statute of limitations requires dismissal with prejudice of the claims against Dr. Lustig as well as several of the defendant judges. The § 1983 claims against Ms. Kahn, Mr. Fellheimer, and the estate of Ms. Phillips must also be dismissed without prejudice because Ms. Kahn and her attorneys were not state actors for purposes of Mr. Mikhail's § 1983 claims. Mr. Mikhail's suit must also be dismissed as to several other Defendants for failure to state a claim: without prejudice as to Ms. Dugan and Mr. Minto, and with prejudice as to Mr. Findlay.

Finally, because all federal claims have been dismissed, the Court will decline to exercise supplemental jurisdiction over Mr. Mikhail's state law claims.

---

enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra disciplinary consequences of violating such a duty.

Pa. R. Prof'l Conduct pmbl. & scope ¶ 19 (emphases added).

\*     \*     \*

Mr. Mikhail shall have until February 14, 2014, to file an Amended Complaint.

An Order consistent with this Opinion follows.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge